J-S21001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONALD WILLIAM SCOTT | : | |
| | : | |
| Appellant | : | No. 1238 WDA 2016 |

Appeal from the PCRA Order July 19, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0018335-2008

BEFORE:  OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                        **FILED JULY 03, 2018**

Appellant, Donald William Scott, appeals from the order entered on July 19, 2016, dismissing his petition filed under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. § 9541-9546.  We vacate in part and affirm in part. Specifically, we vacate the portion of the order that failed to grant Appellant relief on his illegal sentencing claim.  We also vacate Appellant's judgment of sentence and remand for re-sentencing.  In all other respects, we affirm.

The trial court previously explained the facts underlying Appellant's convictions:

> This matter arises out of a shooting which took place in the early morning hours of November 23, 2008 in a parking lot adjacent to a building owned by [Appellant] in Wilkinsburg, [Pennsylvania].  The shooting resulted in the death of Derrick House and the wounding of William [Bennett]. . . .
>
> [Appellant] had rented out a room in his building for a birthday party that started at approximately 9:00 p.m. on

November 22. Although planned for a group of 30 to 40 young teenagers, many more and much older teenagers arrived and were admitted to the party until there was well in excess of 80 people at the party. [Appellant] and other adults assisting him were searching the teenagers for weapons as they entered and providing security throughout the night. . . .

The evidence establishes that the party, for the most part, remained orderly. However, as the party was ending a large group of the older teenagers were leaving and a fight erupted between Defendant and one of the older teenagers, Troy Cole, over a broken gold chain necklace being worn by Cole. This fight, which started inside the building, eventually spilled out into the street behind the building and an adjacent parking lot. . . .

Once outside, several of the other teenagers also began threatening or attacking [Appellant], until he was able to retreat back inside the building. Shortly thereafter, Edric McArthur, one of the adults assisting [Appellant], while trying to disperse the group, also came under attack when he ventured outside the building. [Appellant] went back outside to aid McArthur and again was attacked until he and McArthur could get back inside. . . .

After remaining inside for at least several minutes, [Appellant] decided to go to his car that was parked in the Save A Lot store parking lot, adjacent to his building. A video surveillance camera for the store captured the events that followed, which were also described by three witnesses who were in the parking lot, Shenita Howard, Bennett and Cole. . . .

Bennett, . . . Howard and Cole all testified they saw [Appellant] running to his car and that a large group of the teenagers who had been lingering nearby saw [Appellant] and ran at him as he reached his vehicle. The Commonwealth described it as a group of 15 to 20 [teenagers]. The surveillance video clearly shows [Appellant] running to his vehicle and the teenagers converging on [Appellant] as he reaches his vehicle and struggling with him as he closes or attempts to close his door. One of those running towards the vehicle was the victim, House. . . .

The witnesses further testified that someone then yelled that [Appellant] had a gun. At that point, some of the attackers, including House, can be seen on the video running from [Appellant's] vehicle. Within seconds, at least [three] shots were fired by [Appellant], one of which struck House as he was running with his back to [Appellant] approximately 40 feet away. The bullet, which was believed by the medical examiner to be a high velocity bullet such as a .44 caliber, struck the back of the victim's head resulting in his death. The medical examiner also testified that there was no evidence of gunshot residue, soot or [stippling] which would indicate that House was at close range when shot. Bennett, who was running down Penn Avenue, was shot in his leg, shattering his femur, and arm.

Howard testified that after seeing House shot, she saw [Appellant] standing or pacing outside his vehicle with a silver handgun and then he reentered his vehicle and pulled out from the parking lot. As [Appellant] pulled out of the parking lot [Sergeant] Henry Singer of the Wilkinsburg Police Department, who received a dispatch about a disturbance at 12:20 a.m., pulled into the parking lot. . . .

As he [was] approaching the scene, [Sergeant] Singer heard [four or five gunshots]. He identified the video from the surveillance camera which showed [Appellant's] vehicle pulling out as he pulled into the lot. The video then showed [Sergeant] Singer approaching the victim as he lay in the parking lot. [Sergeant] Singer testified that he secured the area and later searched for evidence but found no shell casings, bullets, guns or other physical evidence.

The Commonwealth called Officer Rory McLaughlin, a Department of Veterans Affairs police officer, who testified that at approximately 3:00 a.m. on November 23 he was dispatched to the VA [Hospital] by emergency room personnel because [Appellant] had come to the hospital saying he was involved in an incident in which shots were fired and he was injured. McLaughlin was dispatched to search [Appellant] for weapons. . . .

McLaughlin testified that he spoke with [Appellant] and [Appellant] described being attacked twice, the second time

- 3 -

at his car, and that he then left the scene and he must have "passed out." [Appellant] did say that shots were fired, however, did not tell McLaughlin that he had fired a gun that night. He also told McLaughlin that he had not called the police, but that he needed to call to report the incident. McLaughlin found Defendant's cell phone on him, but no weapons. McLaughlin also testified that video surveillance at the hospital showed that [Appellant] entered the hospital at 2:50 a.m.

[Appellant] was subsequently interviewed by Detective Thomas DeFelice of the Allegheny County Police at approximately 4:30 a.m. Detective DeFelice testified that [Appellant] described the events that night, but stated that "while he was being attacked he heard three or four gunshots. He was able to kick a male off of him and he made it to his truck. He put his truck in reverse and drove away." He then said that he blacked out but denied firing a gun. When informed that a gunshot residue test could be performed, [Appellant] told the Detective that he was cleaning his gun earlier in the day. At trial, Defendant denied owning or possessing any handguns.

The Commonwealth called Detective Matthews of the Allegheny County Police who testified that he conducted a search of [Appellant's] house and vehicle, finding some ammunition for handguns, including a .44 caliber cartridge on the passenger's side of [Appellant's] vehicle, as well as a magazine and a grip for a handgun. However, no handguns were found.

The Commonwealth also called Detective Kinavey of the Allegheny County Police who identified a digital sketch and measurements made of the scene of the shooting which showed that House was 41 feet, 9 inches from [Appellant's] vehicle when he was shot in the back of the head. He also testified that State Police gun license records showed that [Appellant] was not licensed to carry a firearm.

. . .

[Appellant] testified that he owned the building where the party took place for 15 years. He rented the room for the party, which was to be for 30 to 40 children between the ages

of 11 to 14, and that he asked Edric McArthur, among others, to help him with the part. . . .

The party started at 9:00 p.m. [Appellant] and McArthur patted down the teenagers for weapons as they entered the party. [Appellant] testified that as the party was concluding he got into a confrontation with Troy Cole about his gold chain and during the argument, Cole and three other teenagers jumped him. He said his attackers then ran outside and he shut the door. However, McArthur went outside to disperse the group and he then saw them beating McArthur so he went outside to assist McArthur and was attacked again until he and McArthur were able to get back inside. . . .

He [] waited about [ten] to 15 minutes and then went outside to get his truck to get some of the younger children home and to get medical attention for himself and [McArthur]. As he went to his car, he saw a large group of teenagers running at him and screaming that they were going to kill him. . . .

As he got to his truck they were grabbing, hitting and pulling him. He testified that he didn't have a gun, but as he struggled, "One of them that was standing right directly in front of me, he was grabbing [at] my sweater. The gun came out of his coat." At that time he instinctively grabbed for the gun at which time it went off. He described it as a black revolver. He then testified that he recalls shooting the gun at least one more time and when he did his attackers, "were just there, in front, everyone still. It was just a split second." He testified that he thought his life was in danger but he didn't try to shoot anyone. . . .

[Appellant] testified he then went to a friend's house and then to the VA Hospital for what he described as a gash on his head, bruises and contusions to his face and defensive wounds on his hands, back, and both legs. In the attack [Appellant] also sustained or aggravated a hernia that required surgery and he subsequently suffered a stroke for which he was in rehabilitation. [Appellant] testified that because of the stroke, he had "aphasia", which affected his speech, thinking, and his ability to read and write.

On cross-examination, [Appellant] denied seeing the police coming onto the scene as he drove away. [Appellant] stated

- 5 -

that he did not go straight to the hospital because he blacked out. He denied the gun was his or that he owned any handguns. He testified that he believed that he dropped the gun used in the shooting in the parking lot. He explained the ammunition in his vehicle as ammunition that was transferred from one car to another and that may have been his wife's or someone else's.

The defense also called Edric McArthur who also testified to the fights and the encounters with the teenagers inside and outside the building. However, McArthur did not see or hear the shooting in the parking lot.

The defense also called Medina El, who had rented the room from [Appellant] for her child's 14th birthday party. She confirmed the fact that [Appellant] and McArthur were beaten up and that the teenagers outside were threatening and saying "they had guns." She called 911 because of her fear of the crowd outside. She also believed that [Appellant] was going to his vehicle to help take some of the younger children home.

The defense also called Vlossie Long, [Appellant's] friend, who testified that [Appellant] came to his house about 1:00 to 1:30 a.m. and he appeared to be "a little bit beat up." He said [Appellant] kept saying that they "jumped me." He stated that [Appellant] stayed about 15 minutes and Long told him to go to the hospital.

The defense also presented character testimony through Long and Chris Sullivan, who testified to [Appellant's] long involvement in a boxing program in the area which benefited the young people of the community. . . .

After being appropriately instructed, the jury found [Appellant] guilty of voluntary manslaughter, aggravated assault and carrying a firearm without a license. . . .

Trial Court Opinion, 11/15/11, at 4-10 (internal citations omitted).

On December 22, 2010, the Commonwealth provided Appellant with notice that it intended to seek mandatory minimum sentences of five to ten

years in prison, under 42 Pa.C.S.A. § 9712, for Appellant's voluntary manslaughter and aggravated assault convictions. Commonwealth's Notice Pursuant to 42 Pa.C.S.A. § 9712. The Commonwealth notified Appellant that it was seeking the mandatory minimum sentencing terms because Appellant's convictions were "crimes of violence" and Appellant "visibly possessed a firearm . . . that placed the victim[s] in reasonable fear of death or serious bodily injury, during the commission of the offense[s]." *See id.*; *see also* 42 Pa.C.S.A. § 9712(a) (held unconstitutional in *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014)).

On February 24, 2011, the trial court sentenced Appellant to serve an aggregate term of ten to 20 years in prison for his convictions; Appellant's aggregate sentence included the two above-mentioned mandatory minimum sentencing terms of five to ten years in prison, under 42 Pa.C.S.A. § 9712(a). *See* N.T. Sentencing Hearing, 2/24/11, at 26.

We affirmed Appellant's judgment of sentence on November 29, 2012 and the Pennsylvania Supreme Court denied his petition for allowance of appeal on May 30, 2013. *Commonwealth v. Scott*, 63 A.3d 840 (Pa. Super. 2012) (unpublished memorandum) at 1-21, *appeal denied*, 68 A.3d 908 (Pa. 2013).

On August 22, 2014, Appellant filed the current, timely PCRA petition. *See* 42 Pa.C.S.A. § 9545(b); U.S.Sup.Ct.R. 13(1). The counseled petition raised a number of claims, including that Appellant's "mandatory minimum

- 7 -

sentences are illegal under **Alleyne v. United States**[, 570 U.S. 99 (2013)]."
Appellant's PCRA Petition, 8/22/14, at 16.

The Commonwealth responded to Appellant's petition and conceded that Appellant's sentence was illegal under **Alleyne**. Commonwealth's Supplement to Answer to PCRA Petition, 4/8/16, at 1-2. However, the Commonwealth argued that the remainder of Appellant's claims failed. **See** Commonwealth's Answer to PCRA Petition, 10/29/15, at 1-39; Commonwealth's Supplement to Answer to PCRA Petition, 4/8/16, at 1-7.

On May 9, 2016, the PCRA court held a hearing on the matter. At the beginning of the hearing, the Commonwealth declared:

> Your Honor, . . . two of the issues raised in the [petition] . . . pertain to sentencing. With your permission, I believe the correct way to proceed is essentially bifurcate those issues. If [Appellant] was to in fact get PCRA relief and get a new trial, obviously any sentencing claims are . . . moot. If the PCRA is denied, then at that point the Commonwealth does agree that [Appellant] does need to be resentenced pursuant to **Alleyne**. He had a mandatory minimum. I guess at the end of this proceeding we could pick a date perhaps for that.

N.T. PCRA Hearing, 5/9/16, at 4-5.

The PCRA court and Appellant's counsel agreed to this course of action. **Id.** at 5.

At the conclusion of the hearing, the PCRA court reserved its decision on the matter; the court did not rule on Appellant's illegal sentencing claim. **Id.** at 77-79.

On July 19, 2016, the PCRA court dismissed Appellant's petition *in toto*. Appellant filed a timely notice of appeal; Appellant numbers ten claims on appeal:

[1.] Was [Appellant's] claim for relief properly cognizable under the [PCRA]?

[2.] Did the [PCRA] court err in finding that direct appeal counsel was not ineffective for failing to argue that [Appellant] was entitled to a new trial under the June 28, 2011 amendments to 18 Pa.C.S.A. § 505(b)?

[3.] Did the [PCRA] court err in denying the motion for discovery to obtain the medical records of [] victim William Bennett, and any associated ballistics reports?

[4.] Did the [PCRA] court err in finding that counsel was not ineffective for failing to object to the hearsay opinion testimony given by non-expert Detective Kinavey on the scientific qualities of the surveillance video recording; and that counsel was not ineffective for failing to have the surveillance video professionally analyzed and the quality enhanced, and for not showing it to the jury at normal, full speed?

[5.] Did the [PCRA] court err in finding that trial counsel was not ineffective for failing to utilize the 911 transcript and surveillance videos showing the movements of the crowd prior to the final assault on [Appellant] at his vehicle?

[6.] Did the [PCRA] court err in finding that trial counsel was not ineffective for failing to utilize all available impeachment evidence in cross-examining Commonwealth witness Shenita Howard, and in refusing the court's offer to specifically direct its jury instruction on prior inconsistent statements to [Ms.] Howard's statements?

[7.] Did the [PCRA] court err in finding that trial counsel was not ineffective for failing to document the extent of [Appellant's] injuries at the time of the incident, and the very real effects consequent upon his subsequent stroke, as they

- 9 -

affected the manner of his testimony on the stand and his rehabilitative needs?

[8.] Did the [PCRA] court err in finding that trial counsel was not ineffective for failing to object to the deficient jury instruction with respect to the defense of justification?

[9.] Did the [PCRA] court err in finding that trial counsel was not ineffective for failing to object and move for a mistrial following improper argument by the prosecution?

[10.] Did the [PCRA] court err in not considering the errors cumulatively, and not finding that prejudice resulted from multiple constitutional errors where [Appellant] established the ineffectiveness claims have merit and that counsel had no reasonable basis for his acts or omissions?

Appellant's Brief at 4-5 (some internal capitalization omitted).

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (internal quotations and citations omitted).

Appellant raises ten claims on appeal. Nevertheless (and for reasons this Court simply cannot understand), Appellant failed to raise any claim that the PCRA court erred when it denied him relief on his illegal sentencing claim. We *sua sponte* raise the illegal sentencing issue, vacate the PCRA court's order in part, vacate Appellant's judgment of sentence, and remand for re-sentencing.[1]

_____

[1] We inform Appellant's counsel that, if we had not raised the illegal sentencing issue *sua sponte* and had simply reviewed the specific issues raised on appeal, we would have affirmed the PCRA court's order and the PCRA court would not

As we have held:

> *Alleyne* challenges implicate the legality of a sentence. A challenge to the legality of a sentence may be entertained as long as the reviewing court has jurisdiction. An illegal sentence must be vacated. Issues relating to the legality of a sentence are questions of law. Our standard of review over such questions is *de novo* and our scope of review is plenary.

*Commonwealth v. Ali*, 112 A.3d 1210, 1225 (Pa. Super. 2015) (internal citations, quotations, and corrections omitted).

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the United States Supreme Court held: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 489. Further, in *Alleyne*, the United States Supreme Court expanded "*Apprendi's* basic jury-determination rule to mandatory minimum sentences." *Alleyne*, 570 U.S. at 120 (Breyer, J., concurring). Specifically, the *Alleyne* court held that, where an "aggravating fact" increases a mandatory minimum sentence, "the fact is an element of a distinct and aggravated crime. [The fact] must, therefore, be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S. at 116.

As this Court has held, *Alleyne* rendered the mandatory minimum sentencing statute of 42 Pa.C.S.A. § 9712 wholly unconstitutional. *Valentine*, 101 A.3d at 812. Further, in *Commonwealth v. Ruiz*, 131 A.3d

_____

have had jurisdiction to grant Appellant any form of relief on the illegal sentencing claim.

54 (Pa. Super. 2015), this Court held that an **Alleyne** claim is a non-waivable challenge to the legality of a sentence that may be raised for the first time on direct appeal or in a timely-filed PCRA petition. **Ruiz**, 131 A.3d at 60; 42 Pa.C.S.A. § 9542 ("persons serving illegal sentences may obtain collateral relief"). We also observed in **Ruiz** that **Alleyne** may be applied retroactively to cases pending on collateral review so long as the petitioner's judgment of sentence was not final when **Alleyne** was decided. **Ruiz**, 131 A.3d at 59-60.

With respect to the case at bar, the trial court sentenced Appellant on February 24, 2011, we affirmed Appellant's judgment of sentence on November 29, 2012, and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on May 30, 2013. **Commonwealth v. Scott**, 63 A.3d 840 (Pa. Super. 2012) (unpublished memorandum) at 1-21, *appeal denied*, 68 A.3d 908 (Pa. 2013). Therefore, Appellant's judgment of sentence became final at the end of the day on August 28, 2013. **See** 42 Pa.C.S.A. § 9545(b)(3) ("A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States . . . , or at the expiration of time for seeking the review"); **see also** U.S.Sup.Ct.R. 13(1). Since **Alleyne** was decided on June 17, 2013, Appellant is entitled to the benefit of **Alleyne** and the instant case does not implicate an impermissible retroactive application of that case.

Based on our review of the procedural background of this case and the relevant case law discussed above, we conclude that Appellant is entitled to resentencing without consideration of the mandatory minimum sentencing

provision of 42 Pa.C.S.A. § 9712. Therefore, since the PCRA court erred in dismissing Appellant's petition raising an **Alleyne** challenge, we vacate, in part, the order denying Appellant PCRA relief; vacate Appellant's judgment of sentence; and, remand for resentencing.

However, we conclude that the remainder of Appellant's claims on appeal are meritless and that the opinion of the Honorable Randall B. Todd, entered on July 19, 2017, meticulously and accurately disposes of Appellant's issues on appeal. Therefore, we affirm the remainder of the PCRA court's order on the basis of Judge Todd's thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Todd's opinion.[2]

Order vacated in part and affirmed in part. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

_____

[2] We note that Appellant's trial counsel did not request a self-defense jury instruction based upon the castle doctrine. **See** N.T. Trial, 12/8/10, at 356-370; N.T. Trial, 12/9/10, at 370-384 and 469-502. Therefore, even if the relevant amendments to 18 Pa.C.S.A. § 505(b)(2.1) and (2.5) (regarding the addition of "occupied vehicle" to the castle doctrine) are procedural, Appellant's direct appellate counsel could not have been ineffective for failing to raise the issue, as the issue was waived at the trial level. **See Commonwealth v. Napold**, 170 A.3d 1165, 1168 (Pa. Super. 2017) ("in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at all stages of adjudication up to and including the direct appeal") (internal citations and quotations omitted); **see also id.** at 1168 n.3 (noting that "[a]n exception to the issue-preservation requirement exists where the challenge is one implicating the legality of the appellant's sentence") (internal citations and quotations omitted); Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/3/2018

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,

vs.

DONALD WILLIAM SCOTT,

Petitioner.

CRIMINAL DIVISION

CC NO: 2008-18335

APPEAL

**OPINION**

JUDGE RANDAL B. TODD

COPIES SENT TO:

Counsel of Record for the
Commonwealth of Pennsylvania

Stephen A. Zappala, Jr.
District Attorney

By

Michael Streilly, Esquire
Assistant District Attorney
401 Courthouse
Pittsburgh, PA 15219

Counsel for Petitioner:

Suzanne M. Swan, Esquire
310 Grant Street
Suite 823
Pittsburgh, PA 15219



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | ) ) ) | CRIMINAL DIVISION |
| vs. | ) ) | CC NO. 2008-18335 |
| DONALD WILLIAM SCOTT, | ) ) ) | |
| Petitioner. | ) ) | |

## OPINION

TODD, J.

July 19, 2017

This is an appeal by Petitioner, Donald William Scott, from an order entered on July 19, 2016 denying his PCRA petition. On August 17, 2016 Petitioner filed a Notice of Appeal to the Superior Court. On August 23, 2016 a 1925(b) Order for Concise Statement of Matters Complained of on Appeal was entered. After granting a Motion for Extension of Time to file Concise Statement, Petitioner filed his Concise Statement of Matters Complained of on Appeal on November 7, 2016 raising the following issues:

"A. The court erred in finding that counsel who represented Petitioner on direct appeal was not effective for failing to argue that Petitioner was entitled to a new trial under the June 28, 2011 amendments to 18 Pa.C.S. § 505(b);

B. The court erred in denying the motion for discovery to obtain the medical records of alleged victim William Bennett, and any associated ballistics reports, insofar as the Petition presented exceptional circumstances under Pa.R.Crim.P. 902(E), specifically, that the record supported the Petitioner's belief that the documents would support the theory that Bennett's injuries were the result of gunfire originating from a person or persons other than the Petitioner.

C. The court erred in finding that counsel was not ineffective for failing to object to the hearsay opinion testimony given by non-expert Detective Kinavey on the scientific qualities of the surveillance video recording; and that counsel was not

1

ineffective for failing to have the surveillance video professionally analyzed and the quality enhanced, and for not showing it to the jury at normal, full speed;

D. The court erred in finding that trial counsel was not ineffective for failing to show the jury the available surveillance video clips showing mass movements of the mob of teenagers rushing towards and away from the entranceway to the party premises; and that trial counsel was not ineffective for not presenting evidence corroborating the 911 calls made by Petitioner and Medina El prior to the shooting;

E. The court erred in finding that trial counsel was not ineffective for failing to utilize all available impeachment evidence in cross-examining Commonwealth witness Shenita Howard, and in refusing the court's offer to specifically direct its jury instruction regarding prior inconsistent statements to Ms. Howard's statements;

F. The court erred in finding that trial counsel was not ineffective for failing to submit a motion in limine objecting to the prosecution's use of crimen falsi convictions against defense witness Edric Marthur, which convictions were stale, and their prejudicial effect substantially outweighed their probative value;

G. The court erred in finding that trial counsel was not ineffective for failing to present facts showing that Petitioner's ability to perceive what was happening at the time of the incident was adversely affected by physical conditions, and for failing to present the testimony of an expert witness who would have informed the jury of the extent and impact of Petitioner's injuries at the time of the incident, as well as how his subsequent stroke affected his speech and behavior during trial, particularly during his testimony;

H. The court erred in finding that trial counsel was not ineffective for failing to challenge the deficient jury instruction with respect to the defense of justification by excluding the word "complete" when charging the jury that the use of deadly force for self-protection is not justifiable where "the actor knows that he can avoid the necessity of using force to <u>complete</u> safety by retreating";

I. The court erred in finding that counsel was not ineffective for failing to object to the prosecutor's use of leading questions during direct examination of Commonwealth witnesses Howard and Bennett; and that counsel was not ineffective for failing to object to and move for a mistrial based on the improper argument by the prosecutor (1) based on matters not of record, (2) expressing a personal opinion as to the guilt of the Petitioner, and (3) commenting on the Petitioner's post-arrest choice to remain silent;

J. Where Petitioner established that the issues raising trial counsel's ineffectiveness have merit, and that counsel could not have had a reasonable basis for his or her respective actions or omissions, the court erred in not considering the errors

2

cumulatively, and finding that prejudice resulted from the multiple constitutional violations."

## BACKGROUND

The factual background concerning this matter and the trial testimony was reviewed in the 1925(b) opinion that was filed in this matter on November 15, 2011, and which set for the following:

This matter arises out of a shooting which took place in the early morning hours of November 23, 2008 in a parking lot adjacent to a building owned by Defendant in Wilkinsburg, Pa. The shooting resulted in the death of Derrick House and the wounding of William Bennett. Defendant had rented out a room in his building for a birthday party that started at approximately 9:00 p.m. on November 22. (T., p. 257) Although planned for a group of 30 to 40 young teenagers, many more and much older teenagers arrived and were admitted to the party until there was well in excess of 80 people at the party. (T, p. 155) Defendant and other adults assisting him were searching the teenagers for weapons as they entered and providing security throughout the night. (T., pp. 257-261) The evidence establishes that the party, for the most part, remained orderly. However, as the party was ending a large group of the older teenagers were leaving and a fight erupted between Defendant and one of the older teenagers, Troy Cole, over a broken gold chain necklace being worn by Cole. (T., p. 162) This fight, which started inside the building, eventually spilled out into the street behind the building and an adjacent parking lot. (T., p. 164) Once outside, several of the other teenagers also began threatening or attacking Defendant, until he was able to retreat back inside the building. Shortly thereafter, Edric McArthur, one of the adults assisting Defendant, while trying to disperse the group, also came under attack when he ventured outside the building. Defendant went back outside to aid McArthur and again was attacked until he and McArthur could get back inside. (T., pp. 169, 184) After remaining inside for at least several minutes, Defendant decided to go to his car that was parked in the Save A Lot store parking lot, adjacent to his building. A video surveillance camera for the store captured the events that followed, which were also described by three witnesses who were in the parking lot, Shenita Howard, Bennett and Cole. Bennett, who was later wounded in the shooting, Howard and Cole all testified they saw Defendant running to his car and that a large group of the teenagers who had been lingering nearby saw Defendant and ran at him as he reached his vehicle. (T., pp. 85, 132, 174) The Commonwealth described it as a group of 15 to 20. (T., p. 25) The surveillance video clearly shows Defendant running to his vehicle and the teenagers converging on Defendant as he reaches his vehicle and struggling with him as he closes or attempts to close his door. One of those running towards the vehicle was the victim, House. The witnesses further testified that someone then yelled that Defendant had a gun. (T., pp. 87, 132, 174) At that point, some of the attackers, including House,

3

can be seen on the video running from Defendant's vehicle. Within seconds, at least 3 shots were fired by Defendant, one of which struck House as he was running with his back to Defendant approximately 40 feet away. (T., pp. 217, 224) The bullet, which was believed by the medical examiner to be a high velocity bullet such as a .44 caliber, struck the back of the victim's head resulting in his death. (T., pp. 42-45) The medical examiner also testified that there was no evidence of gunshot residue, soot or stipling which would indicate that House was at close range when shot. (T., p. 42) Bennett, who was running down Penn Avenue, was shot in his leg, shattering his femur, and arm. (T., pp. 135-140)

Howard testified that after seeing House shot, she saw Defendant standing or pacing outside his vehicle with a silver handgun and then he reentered his vehicle and pulled out from the parking lot. (T., pp. 89-91) As Defendant pulled out of the parking lot Sgt. Henry Singer of the Wilkinsburg Police Department, who received a dispatch about a disturbance at 12:20 a.m., pulled into the parking lot. As he had been approaching the scene, Sgt. Singer heard 4 or 5 gun shots. (T., p. 50) He identified the video from the surveillance camera which showed Defendant's vehicle pulling out as he pulled into the lot. The video then showed Sgt. Singer approaching the victim as he lay in the parking lot. (T., p. 52) Sgt. Singer testified that he secured the area and later searched for evidence but found no shell casings, bullets, guns or other physical evidence. (T., p. 53)

The Commonwealth called Officer Rory McLaughlin, a Department of Veterans Affairs police officer, who testified that at approximately 3:00 a.m. on November 23 he was dispatched to the VA Hospital by emergency room personnel because Defendant had come to the hospital saying he was involved in an incident in which shots were fired and he was injured. McLaughlin was dispatched to search Defendant for weapons. (T., p. 192) McLaughlin testified that he spoke with Defendant and Defendant described being attacked twice, the second time at his car, and that he then left the scene and he must have "passed out." (T., p. 194) Defendant did say that shots were fired, however, did not tell McLaughlin that he had fired a gun that night. (T., p. 194) He also told McLaughlin that he had not called the police, but that he needed to call to report the incident. (T., p. 195) McLaughlin found Defendant's cell phone on him, but no weapons. (T., p. 195) McLaughlin also testified that video surveillance at the hospital showed that Defendant entered the hospital at 2:50 a.m. (T., p. 199)

Defendant was subsequently interviewed by Detective Thomas DeFelice of the Allegheny County Police at approximately 4:30 a.m. Detective DeFelice testified that Defendant described the events that night, but stated that "while he was being attacked he heard three or four gunshots. He was able to kick a male off of him and he made it to his truck. He put his truck in reverse and drove away." (T., p. 234) He then said that he

4

blacked out but denied firing a gun. (T., pp. 234-235) When informed that a gunshot residue test could be performed, Defendant told the Detective that he was cleaning his gun earlier in the day. (T., p. 236) At trial, Defendant denied owning or possessing any handguns. (T., pp. 293-294)

The Commonwealth called Detective Matthews of the Allegheny County Police who testified that he conducted a search of Defendant's house and vehicle, finding some ammunition for handguns, including a .44 caliber cartridge on the passenger's side of Defendant's vehicle, as well as a magazine and a grip for a handgun. However, no handguns were found. (T., pp. 204-208)

The Commonwealth also called Detective Kinavey of the Allegheny County Police who identified a digital sketch and measurements made of the scene of the shooting which showed that House was 41 feet, 9 inches from Defendant's vehicle when he was shot in the back of the head. (T., pp. 217, 224) He also testified that State Police gun license records showed that Defendant was not licensed to carry a firearm. (T., p. 218)

At the conclusion of the Commonwealth's case, a colloquy was conducted with Defendant regarding the fact that he was not required to testify and Defendant acknowledged that he wished to testify in his defense. (T., pp. 254-255) Neither at that time, nor at any time prior thereto, did Defendant or his counsel indicate that Defendant was suffering from any type of disability which affected his ability to participate in or consult with counsel concerning his defense. Defendant acknowledged that he wished to testify in his defense. (T., pp. 254-255)

Defendant testified that he owned the building where the party took place for 15 years. (T., p. 257) He rented the room for the party, which was to be for 30 to 40 children between the ages of 11 to 14, and that he asked Edric McArthur, among others, to help him with the party. (T., p. 258) The party started at 9:00 p.m. Defendant and McArthur patted down the teenagers for weapons as they entered the party. (T., p. 260) Defendant testified that as the party was concluding he got into a confrontation with Troy Cole about his gold chain and during the argument, Cole and three other teenagers jumped him. (T., p. 265) He said his attackers then ran outside and he shut the door. (T., p. 266) However, McArthur went outside to disperse the group and he then saw them beating McArthur so he went outside to assist McArthur and was attacked again until he and McArthur were able to get back inside. (T., p. 267) He then waited about 10 to 15 minutes and then went outside to get his truck to get some of the younger children home and to get medical attention for himself and McArthur. (T., p. 268) As he went to his car, he saw a large group of teenagers running at him and screaming that they were going to kill him. As he got to his truck they were grabbing, hitting and pulling him. (T.,

5

p. 269) He testified that he didn't have a gun, but as he struggled, "One of them that was standing right directly in front of me, he was grabbing to (sic) my sweater. The gun came out of his coat." (T., p. 269) At that time he instinctively grabbed for the gun at which time it went off. He described it as a black revolver. (T., p. 271) He then testified that he recalls shooting the gun at least one more time and when he did his attackers, "were just there, in front, everyone still. It was just a split second." (T., p. 275) He testified that he thought his life was in danger but he didn't try to shoot anyone. (T., p. 276) Defendant testified he then went to a friend's house and then to the VA Hospital for what he described as a gash on his head, bruises and contusions to his face and defensive wounds on his hands, back, and both legs. (T., p. 278) In the attack Defendant also sustained or aggravated a hernia that required surgery and he subsequently suffered a stroke for which he was in rehabilitation. Defendant testified that because of the stroke, he had "aphasia", which affected his speech, thinking, and his ability to read and write. (T., p. 279)

On cross-examination, Defendant denied seeing the police coming onto the scene as he drove away. (T., p. 283) Defendant stated that he did not go straight to the hospital because he blacked out. (T., p. 291) He denied the gun was his or that he owned any handguns. (T., p. 293) He testified that he believed that he dropped the gun used in the shooting in the parking lot. (T., p. 297) He explained the ammunition in his vehicle as ammunition that was transferred from one car to another and that may have been his wife's or someone else's.

The defense also called Edric McArthur who also testified to the fights and the encounters with the teenagers inside and outside the building. (T., pp. 308-311) However, McArthur did not see or hear the shooting in the parking lot. (T., p. 314)

The defense also called Medina El, who had rented the room from Defendant for her child's 14th birthday party. (T., p. 326) She confirmed the fact that Defendant and McArthur were beaten up and that the teenagers outside were threatening and saying "they had guns." (T., p. 328) She called 911 because of her fear of the crowd outside. She also believed that Defendant was going to his vehicle to help take some of the younger children home. (T., p. 330)

The defense also called Vlossie Long, Defendant's friend, who testified that Defendant came to his house about 1:00 to 1:30 a.m. and he appeared to be "a little bit beat up." (T., p. 337) He said Defendant kept saying that they "jumped me." (T., p. 339) He stated that Defendant stayed about 15 minutes and Long told him to go to the hospital. (T., p. 343)

The defense also presented character testimony through Long and Chris Sullivan, who testified to Defendant's long involvement in a boxing program in the area which

6

benefited the young people of the community. (T., p. 355) After being appropriately instructed, the jury found Defendant guilty of voluntary manslaughter, aggravated assault and carrying a firearm without a license. This timely appeal followed.

## DISCUSSION

Petitioner filed a PCRA Petition on August 22, 2014 and an Amended PCRA Petition on June 16, 2015. The Commonwealth filed an Answer to the PCRA Petition on October 29, 2015 and a Supplement to Answer to PCRA Petition on April 8, 2016. Petitioner's PCRA Petition and Amended PCRA Petition included Exhibits A through R, which included an expert report regarding the enhancement and analysis of the surveillance video. It was stipulated prior to the hearing that the expert report would be offered into evidence without the necessity of the expert testifying. At the PCRA hearing Petitioner presented the testimony of his physician, Dr. Susan Hoppe; trial counsel, Mr. William Brennan; and, appellate counsel, Wendy Williams. Petitioner did not testify. The Commonwealth presented the testimony of the prosecutor, Ilan Zur. Petitioner now raises several claims of error in failing to find that trial and appellate counsel provided Petitioner ineffective assistance of counsel both at trial and on appeal.

In order for Petitioner to be entitled to relief on the basis that trial counsel was ineffective, Petitioner must show by a preponderance of the evidence ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Brady*, 741 A.2d. 758, 763 (Pa. Super. 1999) This standard requires Petitioner to show: (1) that the claim is of arguable merit; (2) that counsel had no reasonable, objective basis for his actions; and (3) that, but for the errors or omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different, that is, that the petitioner was prejudiced by the alleged ineffectiveness of counsel.

7

*Commonwealth v. Kimball*, 724 A.2d 326, 333 (1999). Counsel is presumed to be effective, however, and the burden rests with the petitioner to overcome that presumption. *Commonwealth v. Pierce*, 527 A.2d 973, 975 (1987), *Commonwealth v. Pirela*, 580 A.2d 848, 850 (1990), *appeal denied*, 594 A.2d 658 (1991). If a petitioner fails to meet any one of these three prongs, then an evidentiary hearing is not necessary. *Commonwealth v. Wells*, 578 A.2d 27, 32 (Pa. Super. 1990)

Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). " '[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.' " *Commonwealth v. Spotz*, 84 A.3d 294, 311–12 (2014)

Petitioner first claims that appellate counsel was ineffective for failing to argue on appeal that Petitioner was entitled to a new trial as a result of the June 28, 2011 amendments to the law in Pennsylvania dealing with self defense. On June 28, 2011 Act 10 of 2011 (P.L. 48) was signed into law amending 18 Pa. C.S.A. §505(b) dealing with self defense or the castle doctrine in Pennsylvania. The amendments to Act 10 were to take effect in 60 days on August 29, 2011. Defendant's trial was held from December 7 to December 9, 2011 and his appeal to the Superior Court was filed on March 30, 2011. Appellate counsel filed Petitioner's Amended Brief for Appellant in the Superior Court on Feburary 24, 2012. The brief did not address the amendments to §505. Defendant contends that the

8

amendments to §505, specifically the addition of subsection (b)(2.1) and (2.5), should be applied retroactively to his case as it was still pending on appeal on the effective dates of the amendments and appellate counsel was ineffective for failing to raise the issue that the amendments were a basis for a new trial. The Commonwealth argues that the amendments should not be applied retroactively as the act did not expressly state that it was retroactive.[1] In addition, even if they were to be applied retroactively Petitioner failed to establish prejudice because regardless of the amendments, Petitioner's use of deadly force under the circumstances was not reasonable, even if the amendments established that the castle doctrine applied to an actor's "occupied vehicle." Finally, the Commonwealth argues that appellate counsel did challenge the sufficiency and weight of the evidence on appeal arguing that Petitioner had a reasonable belief that he was in danger of death or serious bodily injury and that the amendments to §505 would not have altered the appellate arguments.

The amendments to the §505, specifically the addition of subsection (b)(2.1) and (2.5), established a presumption that a person using deadly force had a reasonable belief that deadly force was immediately necessary to protect himself against death or serious bodily injury if the person against whom the force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle. In addition, the amendments added the presumption that a person who unlawfully and by force enters or attempts to enter an actor's dwelling, residence or occupied vehicle or removes or attempts to remove another against that other's will from the actor's dwelling, residence or occupied vehicle is presumed to be doing so with the intent to commit an act resulting in death or serious bodily injury. The amendments at issue provide as follows:

---

[1] "No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S.A. § 1926

9

**(a) Use of force justifiable for protection of the person.**--The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury,** kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
**(i) The person against whom the force is used is in the process of unlawfully and forcefully entering,** or has unlawfully and forcefully entered and is present within, a dwelling, residence or **occupied vehicle;** or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.5) Unless one of the exceptions under paragraph (2.2) applies, **a person who unlawfully and by force enters or attempts to enter an actor's** dwelling, residence or **occupied vehicle or removes or attempts to remove another against that other's will from the actor's** dwelling, residence or **occupied vehicle** is presumed to be doing so with the intent to commit:
(i) **an act resulting in death or serious bodily injury;** or
(ii) kidnapping or sexual intercourse by force or threat.
18 Pa.C.S.A. § 505  (Emphasis added)

The Supreme Court addressed the retroactive application of §505(b)(2.1) in *Commonwealth v. Childs,*

142 A.3d 823 ( 2016). In *Childs* the Court considered the question of whether or not Childs was entitled

to a castle doctrine jury instruction pursuant to 18 Pa.C.S.A. § 505(b)(2.1), which became effective after

Childs was charged with the crimes at issue but prior to his trial on those charges.  The applicable facts

and procedural history in *Childs* are that in November 2011, Childs was tried for murder and possessing

an instrument of crime after he stabbed the victim who was attacking him with a broomstick in Childs'

home.  The victim and Childs were arguing outside Childs' home.  Childs then went inside his house and

the victim entered Childs' home, who was attempting to hold the screen door to the house closed, and hit

Childs several times with a broomstick.  Childs grabbed a knife and stabbed the victim once in the chest

but he died from the wound and Childs was arrested and charged with homicide and possessing

10

instruments of crime. At the first trial Childs was convicted of possessing instruments of crime but the jury deadlocked on the homicide charge. In November 2012, Childs was tried again on the homicide charge. The Supreme Court noted that:

> At both trials, Childs claimed that he acted in self-defense and requested a castle doctrine jury instruction in conformance with section 505(b)(2.1), providing that there is a presumption that he had a reasonable belief that deadly force was immediately necessary to protect himself from serious bodily injury or death because he was attacked inside his residence. N.T., 11/10/2011, at 4–5; N.T., 11/16/2012, at 28–29. In response, the Commonwealth did not dispute that the facts of the case entitled Childs to a castle doctrine defense, but objected to Childs' request on the basis that section 505(b)(2.1) did not become effective until more than a year after Childs stabbed Victim, and that giving the instruction would be an improper retroactive application of a substantive law. N.T., 11/10/2011, at 6–7; N.T., 11/16/2012, at 29. The trial court refused Childs' request at both trials. On November 16, 2012, Childs was convicted of third-degree murder. He was subsequently sentenced to a term of sixteen to thirty-two years of imprisonment for the murder conviction and a consecutive term of five years of probation on the PIC conviction. *Commonwealth v. Childs*, 142 A.3d 823, 825–26 (Pa. 2016)

On appeal, the Superior Court found that the trial court erroneously concluded that providing the jury instruction would have been a retroactive application of the applicable law and reversed the judgment of sentence and remanded the case for a new trial. *Commonwealth v. Childs*, No. 272 EDA 2013, 2014 WL 10788813, (Pa. Super. Ct. Nov. 10, 2014), aff'd, 142 A.3d 823 (Pa. 2016) In reviewing the Superior Court's opinion, it was noted that the sole question before the Superior Court was whether the trial court correctly concluded that section 505(b)(2.1) should not be applied retroactively. The issue before the Court was whether the amendment adding the presumption in 505(b)(2.1) was a procedural or substantive amendment. Noting the Superior Court's statement that "the law of retroactivity is less than a model of clarity" the Court stated:

> The Superior Court began by recognizing that "a statute is impermissibly retroactive if it 'attaches new legal consequences to events completed before its enactment. Retroactive application occurs only when the statute or rule relates back and gives a previous transaction a legal effect different from that which it had under the law in effect when it transpired.' " *Commonwealth v. Childs*, 272 EDA 2013, 2014 WL 10788813, *7–8 (Pa.Super. Nov. 10, 2014) (quoting *Commonwealth v. Robinson*, 7 A.3d 868, 871–72 (Pa.Super.2010)). The Superior Court further recognized that concerns of impermissible

11

retroactive application arise only where the law at issue impairs a vested right or contractual obligation. *Id.* at 8 (citing *Commonwealth v. Johnson,* 520 Pa. 165, 553 A.2d 897 (1989)).

The Supreme Court noted that although the castle doctrine existed at common law in Pennsylvania since its founding, it was not codified in Pennsylvania until 1972, with the enactment of 18 Pa.C.S.A. § 505. The Court further stated that §505 codified existing case law pertaining to self-defense and was intended to set forth in a single rule the law governing the use of defensive force and that the legislature emphasized that §505 made no substantial change to the existing law. *Childs* at 829 (Pa. 2016)

Regarding the amendments to §505 enacted in 2011, the Court stated:

> This statute remained unchanged until the passage of Act 10 on June 28, 2011. The preamble to Act 10 explains that its purpose was to strengthen the right of self-defense. *See* H.B. 40 159th Gen. Assemb., Reg. Sess. (Pa.2011). In so doing, however, Act 10 did not substantively alter the law regarding the use of deadly force within a residence. *Commonwealth v. Childs,* 142 A.3d 823, 829 (Pa. 2016)

In addressing the amendment adding subsection (2.1) the Court stated:

> The presumption created by section 505(b)(2.1) codifies the inference between certain basic facts (an unlawful and forceful entry and knowledge thereof, as described in subsections 505(b)(2.1)(i) and (ii)), and an element of a castle doctrine defense (a reasonable belief that deadly force is immediately necessary). Both before and after the enactment of section 505(b)(2.1), a finder of fact could make this inference, and section 505(b)(2.1) merely provides the factfinder with an evidentiary mechanism to assist in evaluating the merits of making this inference based upon the specific facts presented in the case. We note that the current standard jury instruction directs the jury to "[c]onsider the realities of the situation faced by the defendant ... when you assess whether the Commonwealth has proved beyond a reasonable doubt either that [the defendant] did not believe [he] was actually in danger of death or serious bodily injury ... or that, while [the defendant] did believe that, [that] belief was unreasonable." Pa.SSJI (Crim) § 9.501A (2012). *Commonwealth v. Childs,* 142 A.3d 823, 830–31 (Pa. 2016)

It was noted that the Superior Court concluded that section 505(b)(2.1) did not alter a defendant's rights concerning claims of self-defense premised on actions in the home. It reasoned that section 505(b)(2.1) only "addresses a method of enforcing th[e] right of self-defense" and is therefore procedural. Because there is no prohibition on the retroactive application of a procedural statute, the Superior Court reasoned, Childs was entitled to a jury instruction regarding the castle doctrine. On that basis, it vacated Childs'

12

judgment of sentence and remanded for a new trial. The Supreme Court, affirming the Superior Court, found that:

> Section 505 (b)(2.1) does not, as the Commonwealth contends, broaden the rights of the accused when asserting a castle doctrine defense. Commonwealth's Brief at 14. To the contrary, both before and after the enactment of section 505(b)(2.1), a defendant was justified in using deadly force if he or she was not the initial aggressor and had a reasonable belief that such force was necessary to protect against death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat, and a defendant had no duty to retreat when attacked in his or her dwelling. Likewise, both before and after the enactment of section 505(b)(2.1), the Commonwealth could overcome a claim of self-defense under the castle doctrine by establishing that the defendant did not actually possess the requisite fear or that the defendant's belief was not reasonable. In sum, the section 505(b)(2.1) presumption does not alter either the elements of a castle doctrine defense or the historical right to use deadly force in one's home. Instead, it provides an evidentiary mechanism to aid in the factfinder's evaluation of the merits of a castle doctrine defense. *Commonwealth v. Childs*, 142 A.3d 823, 831–32 (Pa. 2016)

The Court further stated:

> Having determined that section 505(b)(2.1) is a procedural statute, the Commonwealth's remaining arguments are rendered moot. As a procedural statute, section 505(b)(2.1) applied to litigation pending at the time of its enactment as well as litigation commenced following its enactment. *Estman*, 915 A.2d at 1194. Both of Childs' prosecutions commenced after the enactment of section 505(b)(2.1), and so Childs was entitled to a jury instruction in conformance with section 505(b)(2.1). *Commonwealth v. Childs*, 142 A.3d 823, 835 (Pa. 2016)

It was noted that the Childs was entitled to jury instructions pursuant to 505(b)(2.1) because that section became effective **prior to Childs' trials.** The Court stated:

> As section 505(b)(2.1) was effective at the time of Childs' trials, there is no specter of improper retroactive application. The statutory evidentiary presumption was in effect at the time of his trial. **Retroactivity concerns would arise only if a defendant raised self-defense based on the castle doctrine at a trial prior to August 29, 2011 (the effective date of section 505(b)(2.1)), and then filed a post-trial motion after August 29, 2011, arguing that he was entitled to section 505(b)(2.1) jury instruction at his trial. That is not the case here.** *Commonwealth v. Childs*, 142 A.3d 823, 833 (Pa. 2016)

Based on the foregoing holding in *Childs*, Petitioner is not entitled to relief on his claim that counsel was ineffective for failing to raise and argue the amendments to §505(b) on appeal. The Court determined that a jury charge regarding the presumption created in 505(b)(2.1) would only be retroactive to a case in

13

which a defendant raised a claim of self defense based on the castle doctrine in a trial occurring prior the effective date of the act, that is August 29, 2011. As Petitioner's trial commenced on December 7, 2010 and the jury returned its verdict on December 9, 2010 Defendant was not entitled to instructions based on the amendments to §505(b). Furthermore, to the extent that Petitioner argues that he was entitled to an instruction based on the expansion of the castle doctrine to specifically include an "occupied vehicle," it would appear that this provision constitutes a substantive amendment which, pursuant to the holding in *Childs*, would not be applied retroactively.

At the PCRA hearing appellate counsel acknowledged that she did not raise or argue the amendments to §505(b) on appeal stating that:

> My reading of the statute and my understanding of the application of the statute was that although it codified the common law as to the Castle Doctrine which may apply to people in Mr. Scott's situation, that the statute itself was not retroactive and could not be applied retroactive because it was not expressly written into the statute that it had retroactive application. (T, p. 70)

Based on the decision in *Childs*, Petitioner was not entitled to a new trial based on the retroactive application of the amendments to §505(b) to Petitioner's trial held in December 2010. Counsel will not be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649 (2001).

The Commonwealth also argues that even if the amendments were applicable, Petitioner has failed to demonstrate prejudice because the "underlying issue-that Petitioner reasonably believed that he needed to fire his gun in order to avoid death or serious bodily harm" is not affected by the amendments. The Commonwealth argues that appellate counsel challenged the sufficiency and weight of the evidence on appeal specifically arguing that Petitioner had a reasonable belief that he was in danger of death or serious bodily injury at the time that he fired the shots. The Commonwealth further argues that the Superior Court found that there was sufficient basis for the jury to reject Petitioner's self-

14

defense claim and the amendment to §505(b) do not alter or affect this conclusion. As noted by the Supreme Court in *Childs*:

> The presumption created by section 505(b)(2.1) codifies the inference between certain basic facts (an unlawful and forceful entry and knowledge thereof, as described in subsections 505(b)(2.1)(i) and (ii)), and an element of a castle doctrine defense (a reasonable belief that deadly force is immediately necessary). **Both before and after the enactment of section 505(b)(2.1), a finder of fact could make this inference, and section 505(b)(2.1) merely provides the factfinder with an evidentiary mechanism to assist in evaluating the merits of making this inference based upon the specific facts presented in the case.** *Commonwealth v. Childs*, 142 A.3d 823, 830–31 (2016) (Emphasis added)

In this case the Commonwealth conceded that at the time Petitioner was attacked he had a reasonable belief that he was in fear of his life. (T., p. 25) Therefore, the issue of the presumption in the amendments to §505 were not at issue. Consequently, Petitioner has failed to establish prejudice.

Petitioner's second allegation of error is that the Court erred in denying his motion for discovery to obtain the medical records of William Bennett which were no longer available because the Commonwealth lost its file and could not produce the records and trial counsel did not have a copy of the records in his file. In his motion Petitioner alleged that counsel was ineffective for failing to pursue the possibility that Bennett was injured as a result of shots fired from another gun other than that fired by Petitioner. Petitioner argued that there was certain evidence that tended to establish that Bennett's wounds were not consistent with being shot by a gun fired by Petitioner and that he should have been permitted to obtain Bennett's records leave the belief that there may be information in the records that might buttress his theory of other shooters. Petitioner further asserts that his motion for discovery to obtain Bennett's medical records directly from the hospital should have been granted as there were exceptional circumstances to permit the discovery pursuant to Pa.R.Crim.P. 902(E) which provides:

> (E) Requests for Discovery
> (1) Except as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances. Pa. R. Crim. P. 902(E)(2)

15

Petitioner asserts that there is evidence that supports his theory and warranted the requested discovery. The first is that a supplemental police report of Patrolman Gilbert Stubbs of the Wilkinsburg Police Department indicates that he arrived on scene at 00:23 and was asked by Sergeant Singer to attend to Bennett. Stubbs describes encountering Bennett laying on the sidewalk "directly across the street from the parking lot area" and that Bennett indicated he had been shot and that he was "found to have *a small puncture wound* just above his right knee with another to the inside of his left wrist." (*PCRA Petition*, Exhibit "F") Petitioner contends that the fact that Stubbs describes Bennett's wound as a "small puncture wound" contradicts the Commonwealth's theory that Petitioner used a large caliber handgun, such as a .44 Magnum. However, while the Commonwealth argued the gun was a .44 Magnum, the gun, which Petitioner testified he wrestled from one of his attackers and then dropped in the parking lot after he shot it, was never recovered.

During trial the Commonwealth called Detective Matthews of the Allegheny County Police who testified that he conducted a search of Petitioner's house and vehicle and found some ammunition for handguns, including .44 Magnum cartridges in the Petitioner's house and vehicle, as well as a magazine and a grips for handguns. In addition, the medical examiner testified that House's fatal wound was consistent with a .44 Magnum bullet. (See Commonwealth Exhibit 1 which demonstrates a small puncture wound to the back of House's head.) The fact that Patrolman Stubbs characterized one of Bennett's wounds as a small puncture wound is of little significance and does not support the theory that someone else shot Bennett. The evidence was used to contradict Petitioner's assertion that he did not own any handguns. (T., pp. 204-208)

Petitioner next contends that Bennett was on Penn Avenue and not in the direction of the two muzzle flashes from Petitioner's gun and Bennett was not, as the other victim was, specifically identified

16

in the video. As noted above, Patrolman Stubbs described Bennett as being found on the sidewalk directly across the street from the parking lot and there is no evidence that Bennett was so far beyond the range of Petitioner's gun fire that he could not possibly have been struck when Petitioner fired the gun. In addition, the fact that Bennett may have not been in the line of fire of the two muzzle flashes from Petitioner's gun actually captured on the video does not preclude the fact that there may have been other shots fired by Petitioner that simply were not captured on the video. As will be discussed in more detail herein, Petitioner's video expert, Lars Daniel, concludes after analyzing the video that:

> There are two apparent muzzle flashes in the video at the fifth frame at 00:19:38 and the first frame of 00:19:39. With the low framerate of the recording, the only thing that can be determined from the video is that two shots were fired by the defendant. **It cannot be determined if additional shots were fired by the defendant,** or if shots were fired by another person and those muzzle flashes were obscured via the environment, outside the lense (sic) of the camera, or not captured by the camera due to the low frame rate. (June 10, 2015 Video Forensics Report, Amended PCRA Petition, Exhibit "Q," p. 2) (Emphasis added)

There is no support in the video for the theory that some else was firing a gun. In fact, the analysis of the video includes the possibility that Petitioner fired all the shots that were heard by the witnesses. Petitioner's contention that there were one or more other persons firing a gun at the time that Bennett was shot is speculation.

At the PCRA hearing trial counsel testified that he had reviewed Bennett's medical records and did not see anything that was relevant to the issue of ballistics or which would cause him to believe that there were ballistic issues. Counsel testified:

> I know I had reviewed the medical records of Mr. Bennett. I recall that the Commonwealth offered to give me a copy of those, and the file at that point was so copious I chose not to. I reviewed them twice. As I read them, I don't recall any evidence as to what the ballistics were as far as entry and exit. I don't believe there was any opinion as to what form of handgun would have caused the damage that resulted in a broken femur to the victim. I believe he was also shot in the arm. (T., pp. 25-26)

As stated in *Commonwealth v. Reid*, 99 A.3d 470 (2014):

17

A showing of good cause requires more than a generic demand for potentially exculpatory evidence; rather, discovery requests in the PCRA setting must be accompanied by an explanation why the exculpatory information was unavailable to prior counsel and must identify specific documents or items that were not disclosed pretrial or during trial proceedings. *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 261 (2006) ("a PCRA petitioner is not entitled to discovery where he has not shown the existence of requested documents, ... as speculation that requested documents will uncover exculpatory evidence does not satisfy the requirements of Rule 902(E)(2)"). *Commonwealth v. Reid*, 99 A.3d 470, 498 (2014)

This is not a case in which it is alleged that the Commonwealth failed to produce relevant records or documents prior to trial or that trial counsel did not even conduct an examination of the records. Here trial counsel reviewed the records and determined that the records did not provide any evidence that was relevant to the case. Petitioner's claim that the medical records may develop evidence on the issue of causation of Bennett's injuries is speculative and did not warrant discovery pursuant to Pa.R.Crim.P. 902(E), therefore, and the motion for discovery was appropriately denied.

Petitioner next alleges that trial counsel was ineffective in three respects related to the surveillance video. Petitioner first contends that counsel was ineffective in failing to object to hearsay and expert testimony by Detective Kinavey explaining how the video recorded, or did not record, certain events with particular reference to the muzzle flashes. Petitioner cites the following trial testimony of Detective Kinavey:

Q. Did you hear witnesses indicate there were between four and five gunshots?

A. I did, yes.

Q. Did you review the video and still images?

A. I did.

Q. How many muzzle flashes were you able to identify with certainty?

A. Two.

18

Q.      And based on your understanding of how these surveillance cameras work, is there any possible explanation as to why they didn't capture perhaps all of the muzzle flashes, all of the gunshots?

A.      Yes. It was explained to me.

Q.      And what was that?

A.      The explanation given to me was that the way the video captures is it's not like a video camera that you would have at home where it captures every event. It captures different images. Like, you might see a person take a step. Then he might be two steps ahead.

Even on the motion sensor, it just doesn't have the pixels to capture each individual frame of each individual event. So you may lose like a millisecond of each event due to the complexity of the surveillance video as well as the video being - I guess what they indicates was it's a large file. So they try. That's why they have it on motion sensor as well as collecting the individual different frames. (T., pp. 225-226)

Petitioner contends that counsel was ineffective in failing to object to this testimony because that the explanation as to how the video records or captures the movement on the video is expert testimony that Detective Kinavey was not qualified to give. In addition, as Detective Kinavey stated, the information he was testifying to was "explained" to him and his testimony was clearly hearsay. Petitioner argues that counsel was ineffective in failing to object to Detective Kinavey's testimony and it was "clearly prejudicial given counsel's intention to argue to the jury the likely presence of shooters other than Petitioner." (*Memorandum in Support of Amended Petition for Post Conviction Collateral Relief*, p. 27)

A review of all of the trial testimony concerning the video indicates that these technical aspects of the videos were never in dispute and trial counsel testified at the PCRA hearing that he made the decision not to object to Kinavey's testimony for that reason. At the PCRA hearing counsel testified:

**Well, number one, it was, there's no doubt about it.** I chose not to object at that time. I had viewed the tape multiple times. I had discussed the tapes with County Police. I had discussed the tapes with the prosecutor involved in that case, and what was being said is of course what I was told during the frequent times that I saw those tapes. **I knew what**

19

was going to be said. It seemed to be useless to bring in at that point in time an expert to testify to what the detective was actually going to say. So, once again, was it hearsay, yes, and I chose not to object to it. (T., p. 20) (Emphasis added)

Regarding the question of whether or not Detective Kinavey's testimony was harmful or prejudicial, trial counsel testified:

Q. Did you consider Detective Kinavey's testimony on this point to be harmful, that there were four or five gunshots but the video only showed two of them?

A. Frankly, no. My position was that indeed the defendant I knew was going to take the witness stand, and he had said at all times, and had said on the witness stand, there were two shots fired. Obviously we had three to four witnesses testifying hearing somewhere in the range of four to five shots fired. Having seen the tape, we know indeed two gunshot flashes were seen which meant what happened to the other three which was not shown by that tape. In essence the argument would have been that those gunshots may have been by the victims or friends of the victims or whatever else, so I did not see that as per se harmful. (T., pp. 20-21)

On cross examination of Detective Kinavey at trial, trial counsel established that based on his description of the manner in which the video was recorded that, in fact, there could have been two or three shots fired *before the muzzle flashes attributed to Petitioner* and that it could not be ascertained "scientifically" the order of any shots that the various witnesses, including Petitioner, testified they heard. Regarding the number of shots, trial counsel testified at the PCRA hearing that:

"I recall the detective being on the witness stand and asking him very, very specifically if there was any scientific way one can determine if my client fired any more than two shots, and his answer was no." (T., p. 24)

Counsel also pointed out that:

"I outlined to the jury witnesses who claimed that these youth were yelling outside: we have guns, plural, we have guns. I emphasized the fact that five shots are heard and only two arguably can be attributed to my client, . . . " (T. p. 25)

In fact, Kinavey's testimony could be used to buttress and confirm Petitioner's testimony that he heard gun fire *before* the gun that he wrestled from one of his assailants at his vehicle discharged the first time. (T., p. 271)

20

The video expert, Lars Daniel, who analyzed the videos and issued a report attached as Exhibit "Q" to the Amended PCRA Petition, confirms Kinavey's testimony. Kinavey's statement that all gun flashes might not be captured on the video due to the manner in which the cameras captured the video was also confirmed by Daniel, who explained it in terms of "low frame rate." Mr. Daniels explains in his report that upon examining the video he:

> ... [f]ound it to have a frame rate of 6.5 frames per second, or FPF. For a video to be considered live motion (meaning that the video was smooth, not choppy or flickering) the standard is 30 frames per second. (Amended PCRA Petition, Exhibit "Q", p. 1)

Mr. Daniel also states in his report:

> I reviewed pages 221 through 227 of the court transcript, which contains a portion of the testimony of Detective Kinavey. On page 221, Detective Kinavey gives the explanation of why there is a gap of approximately 30 seconds between the video files that were produced from the video surveillance systems by Save A Lot. As a point of clarification, it is important to note that the "missing" 30 seconds is only between the two files containing the entirety of the exported video footage. **This "missing" video in no way impacts the footage of the actual incident and is not related to the explanation of frame rate provided by Detective Kinavey beginning on page 226.** (Amended PCRA Petition, Exhibit "Q", p. 6) (Emphasis added)

In fact, Detective Kinavey's explanation that it is not like a "video camera that you have at home where it captures every event" and that it "does not have the pixels to capture each individual frame of each individual event" is simply a less technical explanation of the same conclusions reached by Petitioner's expert.

Counsel testified that he made the decision not to object to Detective Kinavey's testimony because there was "no doubt about it" and there is nothing in the record to support the present claim that the failure to object was prejudicial because it affected counsel's ability to argue to the jury the likely presence of shooters other than Petitioner. Therefore, to the extent the testimony was either hearsay or expert testimony, counsel had a reasonable basis for his strategy and he was not ineffective in following that course. *Commonwealth v. Williams*, 899 A.2d 1060, 1063–64 (2006)

21

Petitioner next contends that counsel was ineffective for failing to have the videos professionally enhanced and analyzed and expert testimony presented regarding that analysis which would have lead the jury to reach a different verdict. However, upon review of the report and after careful review of the both the video of the shooting presented at trial and the enhanced video, there are no significant or meaningful differences in the videos. The enhanced video is, in fact, somewhat brighter in areas where there is more illumination, that is in the foreground directly under the street lights and in the background from signs or lights on or near Penn Avenue. In addition, while Petitioner's shirt is brighter as he is seen approaching and entering his vehicle, the figures seen rushing toward his vehicle are not significantly clearer or brighter and the events for several seconds at or around the vehicle are not significantly enhanced. Based on the review of the enhanced video and its analysis, there is no reasonable probability that the outcome of the trial would have been any different if the proffered expert testimony and video had been presented at trial.

Mr. Daniel indicates in his report that:

I was asked to determine the amount of time between the change of direction of the crowd approaching the defendant's vehicle and the first muzzle flash. I was also asked to examine the video as it relates to the number of alleged muzzle flashes and if muzzle flashes could have been 'missed' in the recording due to the frame rate of the video (Amended PCRA Petition, Exhibit "Q", p. 1)

Addressing the issue of the time between the reversal of the crowd and the muzzle flash, Mr. Daniel concludes that:

At the sixth frame of **00:19:36 the victim turned and begins to change direction**, occurring before the crowd changing direction; **the crowd then begins to change direction at the fifth frame of 00:19:37. At the fifth frame of 00:19:38 the first muzzle flash can be seen.** The second muzzle flash follows three frames after the first, or approximately .4 seconds after the first muzzle flash on the first frame of 00:19:39. (Emphasis added)

22

Mr. Daniel reaches the conclusion that the time between the change of direction of the crowd and the first muzzle flash is one second. However, he also concludes that the victim changes direction before the crowd changes direction, that is, the victim changes direction at 00:19:36 and is shot at 00:19:38.

Petitioner claims that counsel was ineffective in failing to present expert testimony regarding the video because it would have established conclusively the short time that Petitioner had to actually perceive that the "crowd" was retreating, that is one second, and the time that the first muzzle flash occurred. Petitioner asserts that this analysis could have been used to counter the argument of the prosecutor that the time was 2 or 3 seconds. In his opening statement the prosecutor suggested to the jury that upon seeing the video that "When fires that first shot, as you can see in the video, at least two, closer to three seconds have now passed. Three full seconds have passed since these kids are now retreating, and that is the crux of this, that they are, in fact, retreating." (T., pp. 26-27) Petitioner contends that trial counsel improperly accepted this statement and did not attempt to refute it. This statement of the time between the crowd retreating and the first shot was not repeated in the Commonwealth's testimony or by the prosecutor in closing. However, Petitioner's trial counsel did refer to it in his closing by stating that the Commonwealth's argument that the mob was fleeing for "two or three" seconds was not all that the jury should consider in assessing the circumstances that lead Petitioner to believe that he had a reasonable belief that his life was in danger. Counsel, rather than conceding that only "two or three" seconds was the time involved that the jury should consider, was in fact arguing that the jury should consider the events of the entire night. Counsel stated, in quoting the Court's charge to be given on self defense,

> "Now my point is simply this: What this paragraph tells you, it's context. **It wasn't that second at the car.** It was the evening of the assault after assault after assault. it was the beating on the door say "We got guns." It was the assault outside the door. It was at the car itself. " (T., p. 430) (Emphasis added)

23

In fact, this argument was consistent with Petitioner's testimony and the argument that Petitioner was not even aware that the crowd was fleeing. (T., p. 431) At the PCRA hearing trial counsel testified as follows :

Q.    Well, did you think therefore it might be useful to have an expert to tell you exactly how long the period of time was, whether it was one second or three second?

A.    I did not retain one, sir, and I did not think in terms of that.

Q.    Okay. You argued to the jury that he was in fear of his life. The DA agreed he was in fear of his life. Isn't time to think or retreat a critical element there?

A.    Certainly the lapse of time would be a factor in this case, there's no doubt about it.

Q.    So you felt comfortable -- maybe I'm beating a dead horse here -- you felt comfortable with you just eyeballing it?

A.    I thought that when one looks at the tape -- and of course, as you're aware, in this case the jury had the tape as well with them in the jury room. When one looked at the tape still by still, it would appear to me that -- it appeared to be a very, very fast action. Now, what is defined by fast action. Again, according to the defendant in the case, he indicates at the time between shot one and shot two was a split second. That was his term. (T., p. 27)

Trial counsel further testified that he viewed the videos repeatedly and he was concerned that if the video were enhanced that it could be harmful to the Petitioner as it was conceded by the Commonwealth that Petitioner was being attacked and was in fear for his life. Counsel testified that the video did not show the gun in the Petitioner's hand and if an enhancement had been done, it could have shown him pointing the gun. Counsel testified that the testimony of Petitioner was that although he fired the gun, he never aimed it. If the enhancement showed him aiming the gun at the crowd as they were running away, it could be potentially harmful to the Petitioner. (T., p. 22)

The proffered expert testimony establishes that there was one second from when the crowd began retreating and the first muzzle flash, however, it is unclear how the expert determines exactly

24

when the "crowd" began "retreating" because the movements of the individuals, especially those in close proximity to the vehicle, even in the enhanced video, are less than clear. The expert also concludes that there were two seconds between when House, who did not reach the vehicle, began retreating and the first muzzle flash. Petitioner contends that if the jury would have been told that there was only one second for Petitioner to perceive that the crowd was retreating, as opposed to two seconds, that there is a reasonable probability that the result would have been different. However, this argument fails because it does not take into account all of the evidence that supports the Commonwealth's contention that, whether it was one second or two seconds, Petitioner, absent a credible explanation, had to have perceived that the crowd was running away. The timing of the retreating crowd and the victim as described by the expert was not so significantly different from that which could be perceived by the jury by viewing the video and does not lead to the conclusion that the expert testimony would have affected the outcome of the trial. There was nothing in the expert report regarding the analysis of the videos or the enhanced video itself which establishes that Petitioner was prejudiced by any alleged ineffectiveness of counsel in failing to present expert testimony regarding the videos and this claim was appropriately denied.

Petitioner next claims that counsel was ineffective in failing to show the jury the video at full speed instead of half speed. Petitioner argues that by not playing it a full speed it allowed the Commonwealth to "artificially increase the apparent time lapse, exaggerating the time within which Petitioner was being asked to switch over from legitimate fear for his life when being rushed by the mob. . ." (PCRA Petition, p. 25) However, trial counsel testified as follows:

Q. Is there any reason why you didn't have it played for the jury at full speed?

A. Well, there are certain factors that help the defense by playing it at half speed. When you looked at it at full speed -- I'm sorry, at full speed it is somewhat of a blur. When you look at it at half speed, you basically see this gang of youth come over a hillside, it would seems to swarm this gentlemen's car, to jump on the car.

25

They were on the roof, they were on the hood, they were on the windshield, and of course part of the defense in this case, the major part was the fear he was in at the time, and I think showing it at half speed was able to capture that as opposed to full speed it would not.

Q.   So you don't think showing it at full speed would have shown the full fear and confusion of the incident?

A.   I don't believe so, no. (T., p. _)

Counsel, after having reviewed the video numerous time prior to trial, made a reasonable strategic decision that it was better to show the video at half speed. A review of the video at both half speed and full speed demonstrates that not only does playing the video at half speed prolong the time that it shows the crowd rushing the vehicle, it prolongs the time that the crowd is seen engaging with Petitioner at his vehicle. Petitioner testified to what he perceived as a prolonged struggle with some in the crowd punching and pulling him from the vehicle, which occurred from when he first reached the vehicle until they began retreating. From a review of the video, it appears that the crowd reaches his vehicle door at 00:19:30 and begins retreating no later than 00:19:37, as described in the expert report. At half speed the period of the attack appears longer than when viewed at full speed. Therefore, while there may be countervailing arguments as to whether the video should have been shown to the jury at full speed or half speed, trial counsel's strategy to show it at half speed was reasonable and he was not ineffective in doing so.[2]

Petitioner next asserts that the court erred in finding that trial counsel was not ineffective for failing to show the jury the available surveillance video clips showing mass movements of the crowd of teenagers rushing towards and away from the entranceway to the party premises and for not presenting evidence corroborating the 911 calls made by Petitioner and Medina El, a defense witness, prior to the

---

[2] While the prosecutor testified at the PCRA hearing that during deliberations the jury had the videos and a computer and could have viewed the video at full speed, there is no conclusive evidence that the jury viewed at full speed. (T., pp. 73-77)

26

shooting. As to the surveillance videos, Petitioner presented with his Amended PCRA Petition videos obtained in discovery showing the events outside the entrance to the party room. Petitioner claims counsel was ineffective for failing to show the jury the surveillance video because it would have corroborated the fact that the Petitioner, as well as others in the party room, had a reasonable fear of the crowd. However, there was no significant dispute in this case that there was a large group of teenagers outside the door of the party room and that there were altercations that took place. Petitioner acknowledges in his Petition that, "these clips clearly tended to corroborate the assaults upon the door and upon Mr. McArthur testified to by the Defendant's witnesses, as well as by the Commonwealth's witness, Troy Cole." Mr. Cole testified at length concerning the altercations that took place both inside the building and outside stating:

A.    It seemed like the crowd was start closing in on him.

Q.    Okay.

A.    And then once he start smacking the chairs together, the crowd, they start, like, backing up. And then somebody threw a crate. I didn't quite see who        threw it, but they threw a crate and hit him. Then the crowd attacked the        security guard. That's when Mr. Scott came out.

Q.    Okay. So a crate? Are you talking like - -

A.    Like a milk carton crate.

Q.    Like a plastic crate? You didn't see who threw it, but he got hit?

A.    Yes.

Q.    **And then the crowd jumped him?**

A.    **The crowd started attacking him, took the chair off of him and started hitting him with them. Mr. Scott came out, and they did the same to him.**

Q.    **How many kids are we talking about?**

A.    **A lot of kids. Like, I can't even remember. I know a lot of kids, more than the people that's in here.** (T., p. 169) (Emphasis added)

27

In addition, Edric McArthur, Medina El and Petitioner also testified as to these events and the Commonwealth never disputed that these events took place. Trial Counsel testified that he did not show the videos because they were cumulative, stating:

> The only thing I can say with hindsight is that it was cumulative. We had a number of witnesses there, Miss El, and all the way through. As far as this mass crowd of youth banging on the door saying words to the effect "we have guns", we have witnesses who place that one poor man outside and being attacked by fifteen youth at one time. Again, I was aware of the fact that on cross or whatever else there was no challenge to what had happened at scene one. Now, arguably if I had played the tape of the youth going toward that door in scene one would that have enhanced that sense of fear? Possibly. (T., pp. 35-36)

Clearly the evidence suggested by Petitioner was cumulative and counsel was not ineffective for failing to present cumulative evidence. A defendant is not prejudiced by the failure of counsel to present merely cumulative evidence. *Commonwealth v. Spotz*, 896 A.2d 1191, 1229 (2006)

Petitioner also argues that counsel was ineffective because he "left uncorroborated and therefore opened to disbelief the testimony by Petitioner and Mr. McArthur that they had twice called 911 for assistance and by Medina El that she had called 911, as well." Medina El testified as follows:

Q.     Did you see the assault on Mr. Scott inside that room?

A.     Yes. They started hitting him with chairs. They were, like, all surrounding him hitting him with chairs when they were trying to get them out the door, get them out the door. The broke tables. It was just very chaotic. Once they got them outside of the building where the party was, hey start kicking on the doors, kicking, screaming they had guns.
     **I actually called 911 from my phone**, and I told the operator that they were acting crazy on the other side of the door because we couldn't get out. We couldn't get out of the place. They were still kicking on the door, screaming they had guns, all types of stuff. "Open this f'ing door."
     They were just cussing, and a lot of children that were inside of the party were just scared, terrified. They were crying. **We were trying to contain the children, and that's all I could think of was to call 911.** (T., pp. 328-329) (Emphasis added)

28

Trial counsel also testified that evidence to corroborate that calls were made to 911 was not offered because the fact that the calls were made was undisputed and such evidence would have been cumulative. [3] Counsel testified:

Q. Did you present the testimony that there were prior calls to the Wilkinsburg Police?

A. The testimony came from the client, the defendant on the witness stand. We called a Miss El. Miss El indicated that she had made two telephone calls to Wilkinsburg -- she made two 911 calls, and she was asked at the scene if she knew specifically if the defendant made calls. She said she did not know. The defendant took the witness stand and said I believe he made two calls.

Q. Did you attempt to get 911 recordings or evidence that he had actually made calls to the police?

A. I did not.

Q. And why not?

A. Because it was basically unrebutted in this case. The incident -- I used the term crime scene one of what happened in that so-called party room, party room outside of that, and the witnesses put on, including one of the defense witnesses, I believe a Mr. Troy Coles, basically was unrebutted as to what specifically happened in that area, outside of that area. And as far as I remember, it was not even challenged by the Commonwealth in this case, so I felt no need to corroborate the issue of the telephone calls.
We had two witnesses. Miss El was excellent, and there was no challenge to the fact that she made those calls. (T., pp. 30-31)

Petitioner contends that corroboration of the above referenced evidence was important to establish the fact that Petitioner was in fear of his life at the time of the shooting. However, this issue was never in dispute. In fact, the prosecutor conceded this point in his opening statement saying:

They rushed him as he was entering his car. He made it into the car. All the kids are right on the car, and you can make that out on the video. **At that point, like I said to**

---

[3] Sergeant Singer also testified that he was responding to a call about a disturbance spilling out onto Stoner Way, when he came upon the scene of the shooting. (T., p. 49)

29

**you, I'm not going to argue to you to the contrary. He was in certain fear for his life at that point, and that is clear and not contradicted.** (T., p. 25) (Emphasis added)

Counsel was, therefore, not ineffective in failing to present evidence to corroborate the undisputed testimony regarding the events outside the party room and the 911 calls and this claim is meritless.

Petitioner next contends that trial counsel was ineffective for failing to aggressively impeach the Commonwealth's witness, Shenita Howard, and for refusing a jury charge which would have singled her out as a witness who made prior inconsistent statements. Specifically, Petitioner argues that Ms. Howard was the witness relied upon by the Commonwealth to establish that Petitioner was drunk and unruly throughout the party, the aggressor in the fighting that subsequently ensued and that he acted inappropriately towards certain girls. Petitioner also contends that it was Howard who changed her story from interview to interview and who most radically contradicted the objective facts as recorded by the surveillance video.

The Commonwealth argues that trial counsel did effectively cross-examine Howard regarding inconsistencies between her trial testimony, statements to the police and her testimony at the preliminary hearing. A review of Howard's direct and cross examination demonstrates that trial counsel effectively crossed examined Howard by having her admit that she smoked marijuana with her uncle, the victim House, a couple hours before the party, (T., p. 95); that she gave statements that were inconsistent with Troy Coles regarding the attack on McArthur, (T., p. 102); that she attended a "good number" of parties in the past where there are pat downs for weapons, (T., p. 97); that Petitioner may have misinterpreted some of the dancing that party goers were engaged in as fights, (T, p. 99); that another female adult at the party thought there was a fight going on at the party, (T., p. 100); and, that her testimony at the preliminary hearing regarding the number of shots she heard was inconsistent with her trial testimony. (T., p. 114) In addition, by questioning Howard concerning her recollections and observations, which were directly contradicted by the video evidence, trial counsel clearly created doubts about Howard's

30

credibility. In his closing argument, trial counsel not only argued that Howard was biased and gave inconsistent and incredible testimony but also suggested that her testimony was of little significance. (T., pp. 398-399) Therefore, counsel was not ineffective in failing cross examine Howard.

Petitioner next contends that trial counsel was ineffective for consenting to the Commonwealth's request that the instruction regarding inconsistent statements not "single out" Howard. (T., p. 359) At the PCRA hearing counsel testified:

> I know that the Court had offered to direct it very specifically to Miss Howard, and perhaps I should have joined in on that, it made sense, but at the same time I am not sure that there was any damage done as a result. (T., p. 61)

The jury received an instruction regarding prior inconsistent statements of a witness and that it could consider those inconsistent statements in assessing the credibility and the weight of the testimony. (T., p. 481) In light of the instructions to the jury and the inconsistencies in Howard's testimony that were developed on cross examination, Petitioner has failed to prove that the failure to single out Howard during the jury charge was prejudicial.

Petitioner next contends that counsel was ineffective in failing to submit a motion in limine objecting to the prosecution's use of crimen falsi convictions against a defense witness, Edric McArthur, when those convictions were stale pursuant to Pa.R.E. 609(b) which provides:

> (a) In General. For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere,* must be admitted if it involved dishonesty or false statement.
> (b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
> (1) its probative value substantially outweighs its prejudicial effect; and
> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use. Pa.R.E. 609

A review of McArthur's testimony shows that it dealt primarily with the events and altercations that took place in the party room and outside in the alley as the teenagers were leaving. (T., pp. 304-314)

31

As noted above, there was no substantial or dispute concerning those facts, which were also testified to by other defense witnesses and a Commonwealth witness. McArthur also testified that as he was locking up the room after the event he did not hear any shots in the parking lot, did not witness the events in the parking lot and did not see Petitioner that night after he left to get in his car. (T., pp. 321-322) At the conclusion of his testimony, the prosecutor cross-examined McArthur with respect to his conviction and sentence of 5 to 10 years for robbery and a guilty plea to receiving stolen property for which he received 5 years probation. (T., p. 323) Trial counsel testified that it was a mistake not to challenge the use of the convictions in McArthur's cross examination. (T., pp. 41-42) In addition, the Commonwealth concedes the convictions were stale pursuant to 609(b), however, argues that when considered in the context of the totality of the evidence presented at trial, the error does not undermine confidence in the verdict.

Petitioner contends that he was relying upon McArthur's testimony to vouch for Petitioner's sobriety and reasonable behavior during the early events of the evening and to corroborate Petitioner's and Ms. El's description of the out of control mob which was gathered outside the party premises once the teenagers had been asked to exit. However, as noted above, there were both Commonwealth and defense witnesses that testified concerning those events which were the subject of McArthur's testimony and it is clear that McArthur's testimony was cumulative. Although counsel was ineffective in failing to object to the use of the stale convictions to impeach McArthur, Petitioner has failed to prove any prejudice and this claim is meritless.

Petitioner next contends that it was error to find that trial counsel was not ineffective for failing to present facts showing that Petitioner's ability to perceive what was happening at the time of the incident were adversely affected by his physical condition. Petitioner attached as Exhibit "K" to his PCRA Petitioner's medical records from the Veterans Administration hospital for his treatment on

32

November 23, 2008. Petitioner attaches a radiology report of November 23, 2008 from a CT scan of his head which Petitioner indicates documents that he was suffering from "frontoparietal soft tissue swelling on the left side corresponding to area of injury without fracture or contusion." In addition there is a progress note that notes a small abrasion under the left eye and a ½ cm. curvilinear laceration on the mid-forehead which was described as being "superficial." The records indicate that he had a chief complaint " getting assaulted tonight, laceration to the left forehead, under left eye, reported loss of consciousness, hematoma left side of the forehead." While these records do document some of the injuries that Petitioner suffered, these injuries do not appear to be significant and there are portions of the record that are arguably harmful to Petitioner as it pertains to his injuries and physical condition. For example the records note that he is "alert and oriented," that his nose is "not swollen," that the laceration is "dermal only," and the laceration is "superficial." The records do not document any significant treatment and there is no indication that he required any stitches or bandages to the head laceration. In addition, there are portions of the records that contradict Petitioner's trial testimony regarding the incident itself, such as his statement that during the attack at his vehicle, "He states he was hit in the head and fell to the ground, losing consciousness briefly. He then woke up and drove himself here to the ECC to be seen." (Exhibit "K" - Progress Notes) This statement is contradicted by the video that does not show Petitioner being knocked to the ground or suffering any period of unconsciousness nor does it account for the period of time that he went to his friend's house after the shooting.

There is little in the records from the Veterans Administration Hospital that support the contention that Petitioner would not have been able to perceive what was occurring during the incident. Importantly, although Petitioner testified that he had sustained some injuries during the altercation in the party room with Cole, Petitioner never testified that he was bleeding or suffered any other injury that affected his ability to perceive what was occurring when he left the building and went to his vehicle.

33

Petitioner testified that he suffered "a little blank out" after the gun he allegedly grabbed from one of the attackers fired, but never attributed this "blank out" to any specific injury. (T., p. 283)

Petitioner also argues that counsel failed to admit the complete set of photographs of the Petitioner's "various scrapes and cuts" which would have supported Petitioner's claims of not being able to see clearly as events unfolded because blood having gotten into his eye. (PCRA Petition, Exhibit "L") However, in reviewing Exhibit " L," one of the photographs of Petitioner's face and head showing the laceration on the left forehead and left cheek had already been admitted into evidence as Commonwealth Exhibit No. 193. The Commonwealth also offered in to evidence Exhibits 194, 195, 196 which are photographs of Petitioner's hands and knees. While Exhibit "L" does contain three additional close up photographs of Petitioner's face showing closer views of the lacerations on Petitioner's forehead and cheek, they do not demonstrate injuries that would affect his ability to perceive what was happening at the time of the incident. A review of the other photographs attached as Exhibit "L" show what appear to be relatively minor scrapes on the back of his hands and knuckles, his left knee and right shin, the left side of his back and his right arm. These photos would have no bearing on his ability to perceive the events surrounding the shooting. Petitioner fails to demonstrate how the failure to offer the photographs prejudiced him and this claim is without merit.

Petitioner also claims that trial counsel was ineffective in failing to present expert medical testimony to explain to the jury the effects of the stroke that Petitioner suffered while undergoing surgery in February of 2010 for a hernia and the impact of his symptoms on his ability to testify. At the PCRA hearing Petitioner presented the testimony of Dr. Susan Hoppe. Dr. Hoppe, who is board certified in internal medicine, testified that she was Petitioner's treating physician from 2009 to 2010 and that she had reviewed his medical records for the period from February 2010 to December 2011. (T., p. 7) Dr. Hoppe testified that Petitioner had suffered a left parietal infarct that left him with

34

difficulties both in expressing himself and understanding speech. (T., p. 9) She testified that the stroke also caused some mild cognitive difficulties and memory impairment. (T., p. 9) Dr. Hoppe testified that Petitioner had expressive aphasia which included phonemic paraphasia which meant that he might confuse certain words, for example "he might want to say the word cat and instead he would say the word can." (T., p. 9) In addition, she testified that Petitioner might suffer some difficulty with comprehension , such that he would not answer a question in a way that showed that he understood the question. She also testified that the aphasia could be greater under stress such as when he would be testifying in court. (T., p.10) She testified that the effect of this could be that he would get upset and in attempting to express himself might become tearful. She could not testify if the aphasia would make his mood labile. (T., p. 11) Dr. Hoppe also testified that she had witnessed some tearfulness and frustration which was not typical of Petitioner before his stroke. She testified that it was often necessary to repeat things several times to a patient with aphasia. (T., p.12) She further testified that stroke could affect short-term memory. On cross examination Dr. Hoppe acknowledged that she was not present during Petitioner's trial and that it would be hard for her to actually know how Petitioner responded to questions based on reading the transcript. (T., P. 14) She also acknowledged that in her report of February 2015 she stated that his comprehension deficits would be generally mild. She also stated that his ability to remember the actual events of the incident which occurred in 2008 would not have been affected by the stroke. (T., p. 15)

Petitioner alleges that counsel was ineffective in failing to call Dr. Hoppe or present other expert testimony to establish the effects of Petitioner's aphasia because a physician would have better explained to the jury any difficulties that Petitioner might exhibit in responding to questions or testifying, which might be construed by the jury as Petitioner being evasive or unsure of his testimony. Petitioner also

35

specifically refers to Petitioner's cross-examination in which the prosecutor questioned Petitioner about his crying during his testimony earlier in the day, stating:

Q.    Are you sure that wasn't just a ploy to get sympathy from the jury and that you weren't really crying? Because there was no tears; right?

A.    I was trying back, pulling everything back. I was trying testimony without crying.

Q.    So you're actually saying those were real, honest emotions about the crying?

A.    Yes.

Q.    But your eyes didn't get red? Your nose wasn't running?

A.    Yes, my nose running, yes. (T., pp. 280-281)

In addition, during his closing argument, the prosecutor argued:

"And the way he testified, I really hope that you saw it. I hope you saw through that facade. I hope you saw through the fake crying, the exaggerated stuttering when I was questioning him as opposed to when Mr. Brennan was, his claim of lack of memory, how he doesn't know what's going on. It's an act for you. It's an act for you to sympathize with him, but I hope you saw through it. (T., pp. 453-453)

Petitioner argues that medical testimony confirming his condition would have precluded such questions or argument or, at the very least, lessened their impact.

At the PCRA hearing trial counsel testified that he was aware that Petitioner had suffered a stroke and was undergoing rehabilitation and, "wanted to make sure that he could respond appropriately when called to the witness stand." (T., p. 43) He testified that he noted that the aphasia manifested itself in his discussions with Petitioner, stating:

"Typically if I was posing questions to him on direct, sometimes it would simply take him a time frame to answer. I would ask a question, and typically he would raise his finger and he would give an answer, or then he would just say to me: can you wait a second? And I would wait for a second, and he would give me what the appropriate answer was, at least it was an answer consistent with the prior interviews with him." (T., p. 43)

36

Counsel testified that he met frequently with Petitioner, who was out on bail, to prepare for trial and that he did not recall any tendency by Petitioner to omit words, have difficulty with complex sentences or difficulty with comprehension or having to explain things "more than once." He did describe Petitioner exhibiting what he called a "pregnant pause" between being asked a question and responding. (T., p. 44) Counsel also indicated that while he knew about Petitioner's aphasia, he did not consult with an expert but "read up on the subject area." (T., p. 45) Counsel also testified that he did consider that the jury might interpret the symptoms as a lack of forthrightness and, therefore, elicited testimony from Petitioner that he suffered a stroke while undergoing surgery for a hernia that was aggravated on the night of the incident. (T., p. 78) Petitioner testified as follows at trial:

Q. So did you suffer that stroke during surgery at the VA Hospital?

A. Correct.

Q. Are you in rehab for that now?

A. Yes.

Q. And how long have you been in rehab as a result of the stroke that you suffered while in surgery for the hernia?

A. Every week, and I had to stay for 30 days at the VA in Aspinwall.

Q. And, sir, what effect has that stroke had on you?

A. I have aphasia. It's called aphasia.

Q. What's that mean, sir?

A. My coordination of my speech and my thinking, and I can't -- I could read and write a lot.

Q. And that affects you as of right now, sir? Did you mean to shoot or kill anyone at all, Mr. Scott?

A. No. No. (T., pp. 278-279)

Petitioner contends that counsel was ineffective because the failure to obtain expert testimony left Petitioner wide open to the remarks made by the prosecutor questioning the reality of Petitioner's symptoms. In addition, Petitioner argues that his own testimony and the remarks of trial counsel in his closing argument did not carry the weight that the testimony of a medical professional would have carried. Clearly, presenting medical testimony would have more clearly explained to the jury the symptoms of aphasia. Such testimony may have given the prosecutor pause in questioning Petitioner's symptoms and making the argument that his symptoms were a facade. However, it appears that the emphasis in the prosecutor's argument was that Petitioner's difficulties in testifying appeared to manifest themselves during his cross-examination as compared to his direct examination and were an attempt to garner sympathy, which should not be considered in rendering a verdict. (T., p. 453)

Finally, neither Dr. Hoppe nor Petitioner testified at the PCRA hearing to any particular instances during the trial where he failed to understand a question or demonstrated a lack of ability to express himself and answer questions correctly. Dr. Hoppe testified that it would be difficult for her to point out, simply from reading the transcript, any particular difficulties that Petitioner had during trial. However Petitioner did not testify at the PCRA hearing to any significant difficulties that he experienced. There was no testimony from Petitioner, after having had an opportunity to review the trial transcript, to instances in which he believed that he experienced any inability to understand the questions or respond fully and appropriately as a result of his aphasia. It was previously noted in the 1925(b) Opinion previously filed in this case that this Court did not witness any significant difficulty that Petitioner had in testifying due to his aphasia. While expert medical testimony may have more clearly established the effects of Petitioner's stroke and aphasia there is not sufficient evidence to establish that Petitioner was prejudiced by any failure to call an expert witness to address this issue.

38

Petitioner next contends that the trial court erred in finding that trial counsel was not ineffective in failing to challenge the deficient jury instruction with respect to the defense of justification which excluded the word "complete" when instructing the jury that the Petitioner knew that he could avoid the "necessity of using deadly force with complete safety." The relevant portion of the charge from the transcript states:

> Consider the realities of the situation faced by the defendant here when you assess whether the Commonwealth has proven beyond a reasonable doubt either that he did not believe he was in actual danger of death or serious bodily injury to the extent that he needed to use such force in self-defense or that while he did believe, it was unreasonable for him to do so, or that the defendant knew that he could have avoided the necessity of using deadly force with safety by retreating but he failed to do so. (T., p. 484)

The instruction does not contain the word "complete" and in its post hearing submission the Commonwealth indicates that it confirmed with the court reporter that there is no indication that the transcript is inaccurate. Trial counsel testified at the PCRA hearing that he did not object or request additional instructions because he did not hear that the word "complete" was not used in the charge. (T., p. 49) Petitioner argues that the omission of the word "complete" from the charge was of great important because Petitioner had been subject to not just one but to repeated attacks by the same mob of teenagers and that, "under those circumstances, the concept of safety was clearly a relative term and the difference between potential safety and 'complete' safety was very large." (Memorandum in Support of Amended PCRA Petition, p. 53) While there is no dispute that the word "complete" is included in the standard instruction 9.501 on "Justification: Use of Force/Deadly Force in Self-Defense which was being read to the jury and was inadvertently omitted, it is also clear that there was no improper qualifying words use to describe the concept of safety such as "potential" or "possible." The instructions as whole conveyed to the jury the concept that the Commonwealth had the burden of proving an one of three elements regarding self defense, which included that the defendant knew he

could avoid the necessity of using deadly force with safety by retreating. As stated in *Commonwealth v. Spotz*, 896 A.2d 1191 (2006)

> "In reviewing a challenged jury instruction, we must review the charge as a whole and not simply isolated portions, to ascertain whether it fairly conveys the required legal principles at issue." *Gilbert Jones*, 683 A.2d at 1196. "[I]t is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 899 (1999).
> Spotz insists that his trial counsel was ineffective for failing to object to the trial court's omission of the word "case" from its jury instruction on aggravating and mitigating circumstances. However, as the PCRA court concluded, we find this "hyper-technical semantical claim" to be "patently frivolous." (Opinion of the PCRA Court at 57).
> In *Porter, supra*, this Court rejected a similar hyper-technical claim. There, the appellant argued that it was reversible error for the trial court to instruct the jury that a reasonable doubt was one that "would cause a reasonably careful and sensible person to **restrain** before acting." *Porter*, 728 A.2d at 899 (emphasis added). Instead, the appellant insisted that the jury should have been given the Pennsylvania Standard Jury Instructions: Criminal Section, § 7.01(3) (1979), which states that a reasonable doubt is one that "would cause a reasonably careful and sensible person to **hesitate** before acting." *Id.* (emphasis added). In dismissing this semantical claim, we noted that, "although we have historically considered the language contained in these standard instructions to be an aid in our review, we have not placed our imprimatur upon them." *Id.* Moreover, we also emphasized that the trial court has broad discretion in phrasing its instructions as long as the instruction clearly, adequately, and accurately reflects the law. *Id.* Because the distinction between "hesitate before acting" and "restrain before acting" was *de minimis*, we concluded that such a slight deviation by the trial court was not an abuse of discretion. Similar to *Porter*, we believe that the trial court's omission of the word "case" was *de minimis*. As the PCRA court concluded, "[t]he instructions as given, clearly, adequately and accurately explained to the jury how to use the aggravating *96 and mitigating circumstances in accordance with the law." (Opinion of the PCRA Court at 57). As such, we do not believe that such a trivial omission in phrasing would constitute an abuse of the trial court's discretion. Likewise, as there was no reasonable basis for trial counsel to object to the instruction as given, counsel will not be deemed ineffective for failing to raise a meritless objection. *Commonwealth v. Spotz*, 896 A.2d 1191, 1246–47 (2006)

Considering the instructions given to the jury as a whole, the instruction as given, with the omission of the word "complete," still adequately conveyed to the jury the law regarding the elements that the Commonwealth was required to prove beyond a reasonable doubt to establish that Petitioner did not act

40

in justifiable self-defense. Therefore, Petitioner has failed to establish prejudice and this claim was appropriately denied.

Petitioner next claims that trial counsel was ineffective for failing to object and move for a mistrial following improper argument by the prosecution. As stated in *Commonwealth v. Ali*, 10 A.3d 282 (2010):

> The standards governing challenges to statements by the prosecutor are well-settled: A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. A challenged statement by a prosecutor must be evaluated in the context in which it was made. Not every intemperate or improper remark mandates the granting of a new trial. Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict. *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 668 (2007) (citations omitted). Prosecutor remarks are not objectionable if the remarks "were based on the evidence or proper inferences therefrom...." *Commonwealth v. [Aaron] Jones*, 571 Pa. 112, 811 A.2d 994, 1006 (2002). On the other hand, of course, the prosecutor should not "misstate the evidence or mislead the jury as to the inference it may draw." *Commonwealth v. Shain*, 493 Pa. 360, 426 A.2d 589, 591–92 (1981)
> *Commonwealth v. Ali*, 10 A.3d 282, 307–08 (2010)

Petitioner first submits that the prosecutor improperly asked the jury:

> "Do you think that at the very least Sergeant Singer who testified would know the difference between one gun firing and two guns firing? He said there were four to five shots and nothing about hearing those shots indicated to him that it came from more than one gun because it didn't. (T., p. 439)

On direct examination Sergeant Singer, who was the first police officer to arrive at the scene, testified as follows:

> Q. Now, when you were in route to the location, did you hear anything that drew your attention?
>
> A. Yes. As I was pulling onto the scene, I heard approximately four to five gunshots sounding out. (T., p. 50)

41

Officer Singer was not asked any other questions on direct examination concerning the gunshots that he heard. He also testified that he did not find any weapons at the scene. (T., p. 53) However, on cross-examination Officer Singer testified that when he heard the shots he was approximately 100 feet away and he was sure they were gunshots. He was also asked:

Q. Can you tell us, if you remember, if there was any kind of gap in time between, like, gunshot 1 -- and I know you said 4 or 5, so was there any time lapse between shot 1 and shot 4 or shot 5 or were they somewhat rapid?

A. I can't recall if there was any time lapse between the shots.

Q. Okay. Okay. Now, when you arrive at the scene, you've already heard four or five shots. Are you quite sure that it was four or five shots? Is that one of the things that you're sure about?

A. Yes, that's what I can recall, four or five shots. (T., pp. 58-59)

The prosecutor's argument concerning this issue, including the statement objected to by Petitioner, was as follows:

"There are at least a minimum of three shots that Mr. Scott fired that we know of, and that's based on the injuries. And I submit to you that the four to five shots that everyone said they heard were all fired by Mr. Scott. To suggest there was some other sequence of gunfire is ridiculous. It's not what happened. Do you think that at the very least Sergeant Singer who testified would know the difference between one gun firing and two guns firing? He said there were four to five shots and nothing about hearing those shots indicated to him that it came from more than one gun because it didn't. The only person who had a gun there was Mr. Scott. (T., p. 439)

Petitioner argues that nothing in the record suggests that Sergeant Singer was asked if he could make such a distinction between two guns or that he in any way testified to the non-existence of a second gun firing and that the statement by the prosecutor was complete fabrication. However, the statement by the prosecutor does accurately state that Sergeant Singer testified that he heard four or five shots and did not recall any time lapse between the shots. Whether the prosecutor was referring to this lack of a lapse in the time between shots is unclear. However, given that the statement was in the context of argument and the jury was instructed that the argument of counsel was not evidence and they

42

were the sole finders of the facts based on the evidence that was presented, there is no basis for finding that counsel was ineffective in failing to object to the statement. (T., pp. 472-473)

Petitioner next argues that the prosecutor's arguments concerning the size and characteristics of gun used in the shooting was improper. The prosecutor argued that the gun used was a large gun, a .44 magnum and that "it's not the typical gun that is around these days, which is usually a semi-automatic. They're obviously a lot smaller so they are used for concealment and so forth." (T., p. 439)

The evidence is clear that the gun used in the shooting was not retrieved and the evidence regarding the type of weapon used was circumstantial. Dr. Todd Luckasevic, Associate Medical Examiner and Forensic Pathologist from the Allegheny County Medical Examiner's Office, testified that the injuries sustained by the decedent were consistent with "a large caliber such as a .44 Magnum." and that " a .44 Magnum is a large handgun caliber, it's one of the largest." (T., p. 44) In addition, the Firearm and Toolmark Examiner of the Allegheny County Medical Examiner's Office, Deborah Tator, testified concerning the barrel lengths of a .44 Magnum revolver and testified that it could vary in length, based on the make and model, from two inches to up to about ten and a half inches. (T., p. 246) She also exhibited and demonstrated to the jury a Ruger .44 Magnum revolver that had a barrel length of seven and a half inches. (T., p. 246)

Finally, the Commonwealth presented the testimony of Detective Gregory Matthews of the Allegheny County Police Department who testified that he executed a search warrant on Petitioner's residence which resulted in locating three rounds of .38 ammunition and one round of .358 ammunition. (T., p. 204) In addition, during a search of Petitioner's vehicle that was at the scene of the shooting, he found a .44 Magnum cartridge recovered from the passenger's side of the Petitioner's vehicle and a .44 Magnum cartridge recovered from the center consol. (T., pp. 206-208) The prosecutor's argument is supported by the circumstantial evidence, and the inferences therefrom, that the gun used in the shooting

43

was .44 Magnum owned or possessed by Petitioner. In addition the argument that it was a large gun could also be a justifiable inference from the evidence. However, the prosecutor's argument that the gun is not "typical" or that it is from the "old days" is not specifically supported by the evidence. In fact, Ms. Tator's testimony that the .44 magnum can be found in various barrel lengths depending on the make and model would imply that it is not from the "old days." As noted above, not every improper remark by a prosecutor warrants a new trial. In the context of all of the evidence in this case, and given that Petitioner admitted that he fired a gun during the incident, Petitioner has failed to establish that he was prejudiced by the prosecutors argument concerning the gun used in the shooting.

Petitioner next contends that the prosecutor improperly represented the Petitioner's testimony about his medical issues and the physical manifestations of his aphasia at trial by claiming that they were fake. As discussed above regarding Petitioner's symptoms of aphasia, the prosecutor in his closing argument argued that Petitioner's conduct on the stand was to garner sympathy, which should not be considered by the jury in rendering its verdict. He also argued that the conduct of Petitioner varied depending on whether he was being questioned by his own counsel or the prosecutor. The jury had the opportunity to observe Petitioner and could make its own assessment as to whether or not the argument by the prosecutor was valid. The prosecutor did not misstate any evidence and, therefore, any claim that counsel was ineffective in failing to object to these remarks is meritless.

Petitioner next asserts that trial counsel was ineffective in failing to object to the prosecutor's statements during his closing argument that Petitioner "lied" during his testimony. Regarding the Petitioner's testimony that he did not have the gun used in the shooting and that he got it from one of his attackers and that he dropped it in the parking lot, the prosecutor stated: "And to further suggest that, that's an absolute lie by Mr. Scott." (T., p. 440) ; "He lied to you about what happened with the gun when he dropped it in the parking lot." (T., p 441); "No. 1, he lied about the gun." (T., p. 459)

Regarding the statements made at the hospital where Petitioner went for treatment: "It's understandable, perhaps to argue that after he shoots Derrick and you see him get of the car and he realizes what he's done -- which, by the way, is another lie he told you, that he didn't know he shot anybody, that he told the officer at the VA he didn't shoot anybody. (T., p. 442). Regarding calling the police after the shooting, the prosecutor stated: "He lied about calling the police. He calls the police way before he kills anybody." (T., p. 462)

In *Commonwealth v. Cox*, 863 A.2d 536 (2004) the Supreme Court considered the issue of a prosecutor repeatedly referring in his argument to the defendant as a "liar" and stated:

> Appellant's third claim is that all prior counsel were ineffective for failing to object to alleged prosecutorial misconduct. Appellant argues that, during closing argument, the prosecutor made impermissible statements relating to the testimony of Appellant and Molyneux. First, Appellant contends that the prosecutor improperly referred to Appellant as "a liar" on numerous occasions. Relying on the decision of this Court in *Commonwealth v. Ragan*, 538 Pa. 2, 645 A.2d 811 (1994), Appellant maintains that irrefutable evidence did not exist for the prosecutor to broadly characterize Appellant as "a liar." Second, Appellant contends that the prosecutor improperly argued that Molyneux was not thoroughly versed in his profession, and instead engaged in "hocus pocus" and "mumbo jumbo," which was clearly contrary to the record. Consequently, Appellant avers that trial counsel was ineffective for failing to object to the statements of the prosecutor and, accordingly, appellate counsel was ineffective for failing to raise the alleged misconduct on direct appeal.
>
> In *Ragan*, we explained that a prosecutor cannot intrude upon the exclusive function of the jury to evaluate the credibility of witnesses by broadly characterizing the testimony of a witness as a "big lie." *Ragan*, 645 A.2d at 829 (citing *Commonwealth v. Kuebler*, 484 Pa. 358, 399 A.2d 116, 118 (1979)). We also noted in *Ragan*, however, that "a prosecutor's assertion that a witness had lied does not warrant a new trial when the statement was a fair inference from irrefutable evidence rather than a broad characterization." *Id.* (citing *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365, 369 (1984)).
>
> It is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments is to prejudice the jury, forming in their minds fixed bias and hostility towards the accused that would prevent them from properly weighing the evidence and rendering a true verdict. *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 909 (1991). Similar to the defense, the prosecution is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury. *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316, 1322 (1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). Prosecutorial misconduct will not be

45

found where the comments were based on the evidence or derived from proper inferences. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1377 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). Finally, any allegedly improper prosecutorial comments must be examined within the context of the conduct of defense counsel. *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385, 396 (1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988).

As support for his argument, Appellant notes the remark of the prosecutor during his closing argument in which he stated: "Well, I suggest to you that he didn't tell you what he knew, and he told you three different stories about what he knew and he lied in each one of them." (N.T., May 15, 1987, page 1957). Further, Appellant points to another comment made by the prosecutor during his closing argument in which he asserted: "Let's look at his other statement, the next one he gives, the next scenario of lies he tells." (N.T., May 15, 1987, page 1971).

In rejecting the argument of Appellant, the PCRA court explained that the statements of the prosecutor "were fair comments on the evidence and did not unreasonably inflame or incite the passions of the jury." PCRA Court Memorandum Opinion, June 18, 2002, at 8. We agree. *Commonwealth v. Cox*, 581 Pa. 107, 126–28, 863 A.2d 536, 547–48 (2004)

The statements by the prosecutor that Petitioner lied were in reference to and refuting specific testimony by Petitioner and argument by defense counsel that Petitioner grabbed the gun from one of his attackers and subsequently dropped it on the ground at the scene. (T., pp. 419-421) These arguments addressed the evidence that no gun was found at the scene despite the fact the police arrived and began securing the scene as Petitioner was leaving the scene and cartridges consistent with a handgun were found in Petitioner's vehicle. The comments also address the evidence that indicated that Petitioner stated that he had not fired a gun that day when he at trial he acknowledged, and the video confirmed, that he, in fact, fired the gun. The comments also are directed to Petitioner's testimony that he intended to call the police after the shooting but he didn't have a phone when the VA officer testified that he found that Petitioner had an operational cell phone in his possession and it was the VA officer who called the police. Therefore, counsel was not ineffective for failing to object to the above statements and argument.

Petitioner also claims that the prosecutor improperly referred to the shooting as "murder" when he stated: "And you have to ask yourself, why didn't he call the police? We didn't he report that he just

46

murdered some kid, shot him in the back of the head? (T., p. 462) Although the word "murder" was used, the use of this word in this context does not warrant a finding that counsel was ineffective in failing to object. In *Commonwealth v. Brown*, 711 A.2d 444, 455 (1998) the Court discussed the use of the phrase "child murder" when referencing the defendant and stated:

> "When viewed in context, this reference to Brown's attempts to avoid being arrested as a **child murderer** is not so inflammatory that it rendered the jury incapable of rendering a fair verdict. In an abundance of caution, the prosecutor mitigated any perceived prejudice to Brown when he withdrew this statement in front of the jury. Moreover, the trial court gave the jury two instructions—one before opening statements and another before closing arguments—that the arguments of counsel are not evidence. *Id.* at 52; and N.T., February 16, 1995, p. 24. We must presume that the jury followed these instructions. *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992). Accordingly, no relief is due for this claim. *Commonwealth v. Brown*, 711 A.2d 444, 455 (1998) (Emphasis added)

In this case, despite the fact that the prosecutor used the word "murder" in referencing the act of shooting the victim, it is also clear that he informed the jury that he did not believe that Petitioner shot victim intentionally. During his closing argument the prosecutor stated:

"Mr. Scott obviously is the one who caused the death of Derrick House, and it could be argued that he did so recklessly, as I am to you." (T., p. 456) Considering the context of the statement, counsel was not ineffective failing to object to the statement or move for a mistrial.

Petitioner next alleges that the prosecutor improperly commented on Petitioner's post arrest, post *Miranda* decision to terminate his interview with Detective DeFelice. (T., p. 462) Detective DeFelice testified that he interviewed Petitioner on the morning of the shooting at police headquarters and prior to doing so he gave him his *Miranda* warnings. (T., p. 231). Petitioner waived his rights and during the subsequent interview he denied that he fired a firearm at all that day. (T., p. 235) Detective DeFelice reminded him that prior to the interview they had conducted a gunshot residue test on his hands at which point Petitioner informed Detective DeFelice that he was cleaning his guns earlier in the day. Detective DeFelice then asked him if he shot anybody that night in the parking lot

47

and at that point Petitioner did not answer the question and ended the interview. (T., p. 237) During his closing argument, the prosecutor made the following comments:

> "But that gun was his. Some kid didn't pull it out of his pocket.
> He doesn't report it to the police. He never admits to either the VA officer or Detective DeFelice what he did because he's conscious of his guilt. And when Detective DeFelice says to him, 'Did you fire a gun that night?' He says, 'No, I didn't.' And they responded with, 'Well, remember we did a gunshot residue test on your hands?' He said, 'Well, maybe I was cleaning my guns at home.' And just a brief aside about the gunshot residue kit, it's a test that Detective DeFelice has told you he did on the defendant's hands to show whether or not he recently fired a gun. You didn't hear any evidence about the results of that test because it wasn't in contention in this case. He admits to firing that weapon. So whatever the results were were not brought into evidence because it would be a waste of your time. There's no point in getting into every single detail of this case. It's already admitted by the defendant, and that's the point. But when Detective DeFelice then comes back, 'Are you sure you never fired a gun that night, ' he ends the interview, doesn't answer the question. And why? Because, of course, he knows what he did but he didn't want to admit it." (T., pp. 461-462) (Emphasis added)

Petitioner contends that this comment by the prosecutor was in a direct violation of his Fifth Amendment right to remain silent. At the PCRA hearing trial counsel testified that he did not recall the various comments made during the closing argument of the prosecutor and did not consider making a motion for mistrial on the basis of any arguments that were heard during closing arguments. (T., pp. 50-51) Although the above statement references the termination of the interview, the reference is in the context that Petitioner had already told Detective DeFelice, after being given his Miranda warnings, that he had not fired a gun that day. (T., p. 235)  The statement by Petitioner that he had not fired a gun that day was compared to the evidence on the video, as well as Petitioner's admission at trial, that he had, in fact, fired a gun. (T., pp. 271-272) Although the prosecutor could have referenced both Petitioner's statement during the interview that he had not fired a gun with his admission at trial without discussing the termination of the interview, the prosecutor's statement was not an attempt to use Petitioner's decision to terminate the interview in order to impeach any testimony or evidence subsequently offered by Petitioner at trial that he did not fire a gun, as that issue was not in dispute. Therefore, trial counsel

48

was not ineffective in failing to object to the comment or move for a mistrial as Petitioner has failed to prove that he was prejudiced.

Petitioner's final argument is that it was error to not consider the alleged claims of ineffectiveness of counsel cumulatively and in not finding that prejudice resulted from the multiple constitutional violations. However, no number of failed ineffectiveness claims may collectively form a basis for relief if the claims individually fail to do so." *Commonwealth v. Reid*, 99 A.3d 470, 520 (2014) As a result of all of the foregoing, Petitioners PCRA Petition was appropriately dismissed.

By the Court:

7/19/2017

49